AUGUST GESELL ET AL. *vs.* MARY M. BAUGHER
ET AL.

*Wills—Testamentary Capacity—Evidence.*

The law presumes that every man is sane and has capacity to make a valid will.

Evidence to show lack of testamentary capacity must relate to the mental condition of the testator at the time of making the will, and for the purpose of throwing light upon his condition at that time, evidence of his bodily and mental condition before and afterwards may be produced.

The existence of a delusion in the mind of a testator, even at the time of making his will, as to particular persons or things, does not invalidate the will unless it is the product of the delusion.

The fact that a testator makes an unequal division of the property among his family and gives the greater part of his estate to a grandson to the exclusion of his children does not invalidate the will if the testator had the requisite mental capacity and was free from undue influence.

The evidence adduced by the caveators in this case to show that a testator was mentally incapable of making a valid will examined and held to be legally insufficient to prove that he did not possess the requisite testamentary capacity at the time when the will was made.

Appeal from the Superior Court of Baltimore City (WICKES, J.)

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*Charles E. Fink*, for the appellants.

*S. S. Field*, for the appellees.

SCHMUCKER, J., delivered the opinion of the Court.

The issue presented by this appeal is that of the legal sufficiency of the evidence appearing in the record to show a want of testamentary capacity in the late John Zehner when he executed his will. The appeal is from the rulings of the Superior Court of Baltimore City upon the trial of issues framed under a caveat to the will.

Four issues were sent from the Orphans' Court of Carroll County to the Circuit Court of the same county for trial and afterwards removed to and tried in the Superior Court of Baltimore City. At the close of the plaintiffs' evidence in the Court below the defendants offered four prayers asking the Court to direct a verdict in their favor on the respective issues. The Court granted all of these prayers except the second which related to the issue of testamentary capacity. As to that issue the same prayer was renewed at the close of all of the testimony and was again rejected by the Court. The verdict of the jury upon that issue was against the defendants and hey appealed.

The will was executed on April 17th, 1902, and the testator died on May 19th, 1902, in his seventy-second year leaving a widow who died about one month later. He had but two children both of whom were daughters. Elizabeth, the elder of the two, married August Gesell and died in 1896, leaving surviving, her husband and six children who were the caveatees below and are appellants in this Court. Mary M., the younger daughter, married in 1893, while the family were residing at Catonsville, William H. Baugher, who united with her in filing the caveat to the will.

The testator left an estate consisting of a farm supposed to be worth about $10,000 and personalty of different kinds valued at $7,739, from which must be deducted funeral expenses and possibly an indebtedness to his wife of $3,500. By his will he gave his wife the income of the estate for her life and then gave the farm, and $1,000 to stock it, to his grandson, John Henry Gesell, $1,000 each to two others of his grandsons and the residue of the estate to his three granddaughters, all children of his daughter, Elizabeth Gesell. To his daughter, Mary M. Baugher, he gave but five dollars saying in his will by way of explanation of this small legacy "she having left my house and got married without my knowledge and consent and as she has asserted that she could live without my aid and assistance so I have in contemplation of right and law made this bequest." He gave nothing to Mrs. Baugher's children.

During the last five years of his life Mr. Zehner lived on his farm in Carroll County two miles from Westminster. The husband and six children of his deceased daughter lived with him on the farm until December, 1901, after that his farmer's family lived continuously in the farm house with him, as did also his eldest grandson, John Henry Gesell, for the greater part of the time. For a considerable period prior to his death he was an invalid suffering from dilatation of the heart, dropsy and kidney trouble, but he was not confined to his bed or his house. In the earlier part of his illness he was attended by Dr. M. L. Bott, but from April the 4th, 1902, Dr. James H.

Billingslea, who was then Clerk of the Circuit Court for Carroll County, attended him paying him four or five visits before the execution of the will and paying to him or his wife a number of visits thereafter. On May 14th, 1902, in order to secure better care and management he was taken to a hospital where four days afterwards he died.

We now come to the circumstances of the making of the will. Wm. H. Heagy, the testator's farmer, who lived in the same house with him, testified that he often spoke to him of the will both before and after he made it. The witness said. "Before he made the will he told him he was going to give his grandson, Johnnie, the farm because he said he was his namesake and a good boy, and he didn't want to break the farm up and he would give it all to him." Mr. Zehner also told John Poisel, who was sent by his lodge of Odd Fellows to nurse him, that he intended to make a will and give the farm to his grandson, John, saying "I can't break the farm or I would divide it equally, I don't like to break the farm (he said), none would have anything if I break the farm." He told the wife of the same witness on the day before he made the will that he was going to make his will and cut his youngest daughter short as she had said she did not need his money. He also told Frank Eckenrode, a neighbor, that Johnnie was to get the farm; and two years before making the will he told Joshua F. Magee, another neighbor, that Johnnie Gesell was to have the farm saying, "That is my boy, don't he look like me, * * he is the one that gets the farm."

Early in April. Mr. Zehner, being in Westminster, met George A. Miller, Dr. Billingslea's deputy clerk, who was also a scrivener and asked him if he could make a will to which Miller replied in the affirmative. He met Mr. Miller again about a week before the execution of the will and said to him I have not forgotten that paper I wanted you to write. On the Sunday previous to the making of the will he went to Mr. Miller's residence and gave him directions for making the will leaving with him in that connection a will which he had formerly made. Mr. Miller testified that he drew the new will

as directed; copying into it *verbatim* from the old one the provisions for the testator's daughter, Mary M. Baugher, and he thought he had also copied into it the provision for the testator's wife from the old will.

On the day of the execution of the will Mr. Zehner went to the Clerk's office in Westminster and executed it in the presence of Mr. Miller and Dr. Billingslea both of whom attested it as subscribing witnesses.   Mr. Miller testified positively that when he asked Dr. Billingslea to step from the Clerk's main office into the vault where the will was about to be signed he said to the Doctor. "You know of course what Mr. Zehner wants you to do, he replied 'Yes,' I said he wants you to witness this will and Mr. Zehner said 'yes I wanted you and Mr. Miller,' and he said to him 'Doctor I can make a will can't I,' and the Doctor said 'why certainly.' " The will was then executed and attested by Mr. Miller and the Doctor and left in the vault of the office until produced in Court in this case.

After the will had been executed, Mr. Zehner told Andrew W. Schmidt, who was then buying cattle from him, that he had made his will and given the farm to his eldest grandson and also $1,000 to buy stock with so he wouldn't be short, "he said the farm alone wouldn't be no good unless he had some money to work it."   He told the same witness that he had willed his daughter, the one who was married, in or near Catonsville, only five dollars, but he at that time assigned no reason for giving her so little.   Schmidt's testimony as to the testator's statement that he had by his will given the farm and $1,000 to his grandson was corroborated by Andrew Bodennard who was present and heard it.   Mr. Zehner also told Mrs. John Poisel after he returned from making his will that he had given the farm and $1,000 to his grandson, John Gesell, and that he had given his youngest daughter but five dollars.

We will next consider the legal sufficiency of the testimony produced to overthrow this will, made under circumstances of so great deliberation, upon the ground of the testamentary incapacity of its author.   In disposing of this part of the case it is important to bear in mind two fundamental propositions which are especially applicable to it.

*First.* The law presumes every man to be sane and to possess the requisite capacity to make a valid will. *Brown* v. *Ward*, 53 Md. 382; *Higgins* v. *Carlton*, 28 Md. 142; *Davis* v. *Denny*, 94 Md. 392.

*Secondly.* Testimony in order to be legally sufficient to overthrow the presumption in favor of sanity and capacity must be directed *to the date of the execution of the will* and must tend to show that the testator was *at that time* incapable. For the purpose of shedding light on his condition at that time, but for no other purpose, evidence of his bodily and mental condition both before and afterwards may be produced. *Davis* v. *Calvert*, 5 G. & J. 300; *Brashears* v. *Orme*, 93 Md. 447, but if the opinion of the witness is desired to prove not capacity but incapacity the question put to him must be such as to limit the inquiry to the date of the making of the will. *Jones* v. *Collins*, 94 Md. 410; *Brashears* v. *Orme, supra.*

The caveators in this case rely especially upon the testimony of Dr. Billingslea, one of the subscribing witnesses to the will. the Doctor, after testifying generally as to Mr. Zehner's illness and the professional visits made to him in that connection, said that he was a troublesome patient who would not follow directions as to taking his medicine and nourishment and abstaining from moving about, and that he once suspected the persons who had lived with him of trying to poison him. The doctor was then asked this question. "From your observation of Mr. Zehner during this time you were attending him state whether or not in your opinion he was of sound and disposing mind and capable of executing a valid deed or contract." He replied "I don't think so."

When the doctor was pressed in cross-examination to state, whether in his opinion Mr. Zehner, *at the time he executed his will*, was of sound and disposing mind and capable of executing a valid deed or contract, he wavered greatly in his testimony and finally said that he didn't see enough of him to say yea or nay to that question. As this is a vital part of the case we insert here the cross-examination on that point.

Q. Do you mean to say doctor that on the day Zehner ex-

ecuted this last will and testament he was not of sound and disposing mind and capable of executing a valid deed or contract?

A. I say that a man who was suffering with disease as he was who was unmanageable and who would say to me without any provocation that those people whom I knew were just as careful about him, the people he was living with, the man and wife, and he would say without provocation that those people would poison him, I think that man's mind was, he was then in the condition of mind that he could not properly make a valid deed and instrument.

Q. That is not my question, did you believe at the time he executed this will he was not capable of making a valid deed or contract ?

A. I think I have answered that question.

Q. Can you not answer it yes or no?

A. That was much later of course, that day, I will be very frank and say yes; that was because of the mind being very much weakened and in a condition to accuse people of poisoning him and doing a great many other things; he was not what the average person would call crazy, he was not that sort but he was in the condition that he did not properly take his medicine or do the things he was told, which more or less aggravated his trouble and he was not in the condition a man wants with a clear mind to execute a proper paper that requires that care a great many people do because they are peculiarly (interrupted.)

Q. You don't answer my question·  I asked you whether on the day he executed this will at the time he executed it, whether he was capable of making a valid deed or contract?

A. *Well I will say this.  I think I didn't see enough of him to say yea or nay to that question.*

Q. I will ask you this question.  Did you not tell me on two occasions that you believed that that time as far as you could see that he was capable of making a valid deed or contract?

A. I may have said that because I did not see much of him.

· : In answer to other questions the doctor said the first thing that struck him seriously as to Mr. Zehner's mental condition was his coming to his (the doctor's) office at 6 or 7 o'clock one :cool morning before breakfast and, when he was reproved for coming out so early, said they (meaning Mr. and Mrs. Heagy) would poison him. The doctor replied to him those people would not poison you. There are no better people in the :country than they, when the subject was dropped and other :matters taken up for discussion.

The doctor thought that this early visit to him occurred prior to the making of the will but on cross-examination he admitted 'that he could not tell whether it was before or after that event. Heagy and his wife who lived in the same house with Mr. Zehner testified that he only went to the doctor's once before breakfast and that was but a few days before he went to the hospital which was nearly a month after the will was made.

We do not regard the testimony of Dr. Billingslea as legally sufficient to show a want of testamentary capacity in Mr. Zehner when he made his will. Leaving out of view the question of its credibility, which is not to be passed upon by us in a case like the present one, this testimony when fairly considered, amounts on its face to no more than a statement that the witness is unable to say whether the testator was or was not possessed of testamentary capacity when he made his will. Such ambiguous testimony would if sent to a jury tend to confuse and not to enlighten them and would more probably prevent than facilitate their arrival at a just verdict. The salutary presumption of sanity and competency to which every man is entitled under the law ought not to be overthrown or his right of testamentary disposition of his property imperilled by such inconclusive and uncertain testimony as that of this witness.

The non-expert witnesses who expressed an unfavorable opinion of Mr. Zehner's testamentary capacity were his brother-in-law, Jacob Freund, and Mrs. Arnold, who was Mrs. Zehner's nurse. Freund testified that he paid Zehner six or seven visits between March and May, 1902, and conversed with him about

his health and other matters.    He was then asked the question.   "During your visit, you say you went up there a-half dozen times or more between March or May, what impression was produced upon your mind by his appearance, his conduct and his talk as to his mental condition.    To this question Freund replied, "Well I thought he was not altogether right that he was a little out of his mind, that was my opinion the · first time I saw him when he called me up there."

Mrs. Arnold testified that she nursed Mrs. Zehner during the last three months of her life and constantly saw Mr. Zehner until he went to the hospital, which must have covered a period of about two months, that he quarreled with his wife, and talked to himself and sometimes looked wild out of his eyes and that one morning when she awoke about four o'clock he was standing over her and had his cane raised and when she asked him what he was going to do he walked away without answering her.    She was then asked.    "From what you observed of him what he did and what he said and the way he looked while you were there waiting on his wife, what impression was made on your mind about his mental condition?" She replied.    "Well I thought he was a little wild from the way he talked."    Neither of these questions nor the answer thereto measures up to the standard set by us in *Jones* v. *Collins, supra,* as the attention of the witness was not sufficiently directed to the time of the execution of the will, and the answers were too vague and inconclusive as to tend to show any permanent mental derangement of the testator from which an incapacity to make his will when he did so could be rationally inferred.

Several of the witnesses for the caveators testified that Mr. Zehner during his last illness at different times said that Mr. and Mrs. Heagy who lived with him were trying to poison him.    These occasional statements do not indicate the presence in his mind of such a fixed and persistent belief on that subject as would amount to a delusion; but if it be admitted that his fear of being poisoned did amount to a delusion that would not necessarily have rendered him incapable of making a

valid will. Mr. and Mrs. Heagy bore no relation to the subject-matter of the will or the objects of his bounty and there is no evidence that the will made by him was the result of the alleged delusion or that any of its provisions were influenced thereby. It is well settled that the existence of a delusion in the mind of a testator, even at the time of the making of his will, as to particular persons or things will not invalidate the will unless it is the product of the delusion. *Jones* v. *Collins*, 94 Md. 414; *Theobald on Wills*, p. 15; *Middleditch* v. *Williams*, 45 N. J. Eq. 726; *Orchardson* v. *Cofield*, 171 Ill. 14; *Potter* v. *Jones*, 12 L. R. A. 161; *Am. & Eng. Ency.*, 2 ed., vol. 28, p. 80, and cases there cited.

Other witnesses testified that Mr. Zehner at times during his illness complained that his memory was not as good as it had formerly been, that his head was a little out of order, or that he felt "dume" in his head, that they gave him too much medicine, that they wanted to poison him, and also that when he was in great pain "he did not speak altogether right," but when the pain passed off he was all right again. In view of his age and the fact that he at times suffered intense pain and was given medicine with morphia in it, these isolated occurrences mostly transient in their nature and not connected directly with the will by the testimony do not tend to show a want of testamentary capacity when he made the will.

It was also proven that John Henry Gesell the grandson to whom the farm was given by the will said two or three weeks after it was made that his grandfather was crazy and did not know what he was doing; that he kept him awake all night and would tell him to hook up the horse and wait until he (the grandfather) got his pains, instead of waiting until the pains came to hook up the horse; and that few days afterwards John Henry Gesell said that his grandfather "was drinking and crazy and had him up all the rest of the night running for the doctor or medicine." The counsel for the caveators urged in the argument that this testimony proved an admission of the insanity of the testator by one of the caveatees who was a beneficiary under the will. Statements such as

those thus made by a young man, then about seventeen years old, who had been annoyed by the deprivation of his night's rest could hardly be seriously regarded as an admission of the fact of such insanity of the testator at the time he made his will as would deprive him of testamentary capacity, even if they did amount to an admission that the young man thought that on the occasion to which he referred, the date of which does not appear from the evidence, his grandfather did not behave rationally. The presumption of the law being in favor of sanity and testamentary capacity, the evidence to support a caveat on the issue of insanity must ordinarily tend to show either that the testator was of unsound mind at the time of the execution of the will or that he was affected with *permanent insanity* prior to its execution, in which latter case the burden of proof of capacity is shifted to the caveatee. *Taylor* v. *Creswell*, 45 Md. 430; *Higgins* v. *Carlton*, 28 Md. 115; *Tyson* v. *Tyson*, 37 Md. 582; *Davis* v. *Calvert*, 5 G. & J. 300.

The remaining ground relied on by the caveators to establish the incapacity of the testator is the uneven division of his property among his descendants which he made by his will. There was much evidence tending to show that his daughter, Mrs. Baugher, who was cut off in the will with five dollars, had been a dutiful and affectionate daughter and had done nothing to justly merit her father's displeasure. Several witnesses testified that the father himself had in past years spoken in terms of high appreciation of this daughter's character and services, but the evidence is clear that he had taken a strong prejudice which he never abandoned against her marriage and she seems never to have attempted to remove that prejudice. The portion of the estate given by the will to the children of the testator's other daughter, Mrs. Gesell, is also unequally divided between them, the eldest child getting the lion's share.

It is well settled that although the provisions of a will may in some cases furnish intrinsic evidence involving it in suspicion and tending to show the testamentary incapacity of its author, the law concedes to a man of sound mind the right to dispose of his property in any manner he may deem proper not incon-

sistent with its policy. The fact that a will makes an unequal division of property among the testator's family or gives his estate to strangers to the exclusion of his own blood will not invalidate the instrument if the testator had the requisite mental capacity and was free from undue influence when he made it. *Cramer* v. *Crumbaugh*, 3 Md. 500; *Davis* v. *Calvert*, 5 G. & J. 300; *Hiss* v. *Weik*, 78 Md. 448; *Schneider* v. *Manning*, 121 Ill. 376; *Potter* v. *Jones, supra*; *A. & E. Ency.*, 2d ed., vol. 28, p. 105, and cases there cited in note 3.

It is so sclear from the evidence in this case, that the inequality of the division of the estate devised by the will was the subject of deliberate forethought and fixed purpose, that there is no room for the contention that it resulted from an abnormal mental condition of the testator when he made the will. He repeatedly stated, during the several years before he executed the will, that he intended to give the farm and $1,000 to his grandson, Johnnie Gesell, and assigned the reasons therefor which have already been mentioned. In the will he put on record what to him was a sufficient reason for cutting off Mrs. Baugher, and the scrivener who drew the will testified that he had copied that portion of the will *verbatim* from an earlier one left with him for that purpose by the testator.

Upon the whole case we are of the opinion that in view of the deliberation with which the will was executed and the absence of evidence from which a jury could rationally find that at the time of its execution, the testator was not mentally capable of executing a valid will the Court below erred in not granting the seventh prayer of the caveatees which directed the jury to render a verdict for the defendants for want of legally sufficient evidence that the testator did not possess the requisite testamentary capacity when he made the will. *Safe Deposit Co.* v. *Berry*, 96 Md. 45.

We find no reversible error in the action of the Court below in granting the prayers of the plaintiff which state the law applicable to the case with substantial accuracy.

All of the testimony, which formed the basis of the Court's rulings on evidence was admitted and as we have held it to be

legally insufficient even if considered as properly admitted to establish the case of the caveators, it is useless to review those rulings of the Superior Court.

For the reasons already stated the rulings appealed from must be reversed and the case remanded.

*Rulings reversed and case remanded.*

(Decided March 24th, 1905.)