CYRUS C. CRONIN, Executor, *v.* FLORINE KIMBLE ET AL.

[No. 93, October Term, 1928.]

490

*Decided January 31st, 1929.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, PARKE, and SLOAN, JJ.

*J. Wilmer Cronin* and *Robert H. Archer,* for the appellant.

*Stevenson A. Williams,* with whom was *Edwin H. W. Harlan* on the brief, for the appellees.

SLOAN, J., delivered the opinion of the Court.

On August 26th, 1926, Robert W. Kimble executed his last will and testament, admitted to probate and record by the Orphans' Court of Harford County, whereby he gave the farm whereon he resided, with the household furniutre, livestock, and farming implements, to his nephew, George F. Kimble, "with the understanding the said George F. Kimble is to pay to Phebe Sullivan" (a grand niece) five hundred dollars if living at the time of the testator's death, the resi-

due to be divided between his nieces and nephews, children of his deceased brother George Kimble, namely Hattie Sewell, Lillian Lee, Phebe Lentz, Sam Kimble, and Harvey Kimble, Phebe Sullivan, daughter of M. F. Sullivan, Florine Kimble if she is not married at the time of his death; the children of his deceased brother William Kimble, "to receive one share to be divided among them."

The will was written by Cyrus C. Cronin, appellant, a justice of the peace, who was named as executor, was signed by Robert E. Kimble and witnessed by E. E. Touchton and Howard K. McComas. The testator died September 25th, 1926, thirty days after the will was executed.

A caveat to the will was filed in the orphans' court by Harry K. Kimble and Florine Kimble on the usual grounds, was answered by the executor, and thereupon issues were sent to the Circuit Court for Harford County for trial of the following questions: 1. Was the alleged will signed by the testator or by any person in his presence for him by his direction? 2. Was it attested and subscribed in his presence by two or more witnesses? 3. Was it executed by Robert E. Kimble when of sound and disposing mind and capable of executing a valid deed or contract? 4. Were its contents read to or by the testator and known and understood by him at or before its execution? 5. Undue influence.

At the close of the caveator's case, the caveatee offered five prayers, one on each issue, for directed verdicts, and the court instructed the jury to answer favorably to the caveatee on the first, second, and fifth issues, thus leaving for the consideration of the jury the third and fourth issues. The caveatee then proceeded with the examination of his witnesses, and the trial resulted in a verdict for the caveators on the third and fourth issues, and it is from this verdict the appeal is taken by the caveatee.

The caveatee, appellant, reserved twenty-six exceptions, of which the first twenty-three were to rulings on the evidence, the remaining three to rulings adverse to the appellant on the prayers. The first eleven exceptions, numbered one, 1A to 1D, and two to seven inclusive, were all on questions relating

to a will made by the testator in 1923, whereby he left his farm to Harry K. Kimble for life, at his death to be sold by the executor and, after the payment of five hundred dollars to Phebe Sullivan, the proceeds to be divided equally between seven nephews and nieces; the residue of his property, after giving another five hundred dollars to Phebe Sullivan, a grand niece, to be divided between the seven nieces and nephews and a brother, William Kimble, the will of 1923 further saying, "Harry K. Kimble is not to receive any cash from my estate." Cyrus C. Cronin was named as executor.

The questions one to seven objected to were admissible because it was proper for the appellee to show that the testator had formerly expressed the wish that some different disposition be made of his property, it having been conceded that he was sane at that time and that he then recognized that those named in the former will had some claims on his bounty. Some of the questions objected to were addressed to Harry K. Kimble, who testified that the former will was made by his uncle in pursuance of an understanding or agreement that he was to have the farm as long as he lived, in consideration of his interest in the canning business, in which he had been associated with his uncle some years before. If this were true it would be evidence of his claims on his uncle's bounty.

It is not sufficient to avoid a will that a testator has made an unequal distribution of his property, or has excluded persons having claims on his bounty, or contrary to his expressed intentions, no matter how injudicious or imprudent the provisions of the will may be, but such evidence is admissible and may be considered in determining the sanity of the testator. *Davis v. Calvert,* 9 G. & J. 269; *Crockett v. Davis,* 81 Md. 134; *Gesell v. Baugher,* 100 Md. 677, 688; *Harris v. Hipsley,* 122 Md. 418, 428; *Smith v. Shuppner,* 125 Md. 409, 416, 417; *Dudderar v. Dudderar,* 116 Md. 605, 610.

The eighth exception was to the admission of a question to which the witness said he knew nothing, so that it did no harm. Exceptions nine to fifteen were to the admis-

494

sion of questions addressed to Arthur Magness, the only witness called by the appellees, who testified to the mental capacity of the testator. Mr. Magness had known him for thirty-seven years and had been his nearest neighbor for the last fourteen years, living within two hundred yards of the testator's house, and he or some of his family saw the testator nearly every day. The testator had heart disease, myocarditis, the last five or six years of his life, and frequently required attention, and witness often called Dr. Roth to minister to him, and frequently the witness' family cared for him at their home. The witness, Magness, had not seen the testator from some day prior to August 23rd, when George Kimble, the devisee of the farm, came to visit his uncle, until after he left on September 6th, and his testimony can, therefore, only be considered as a proffer of evidence of permanent incapacity, in view of the evidence of the attesting witnesses, E. E. Touchton and Howard K. McComas, and of the attending physician, Dr. Charles E. Roth, who testified without contradiction that on August 26th, 1926, the testator was mentally competent.

"The presumption of law being in favor of sanity and testamentary capacity, the evidence to support a caveat on the issue of insanity must ordinarily tend to show either that the testator was of unsound mind at the time of the execution of the will, or that he was affected with permanent insanity prior to the execution." *Gesell v. Baugher*, 100 Md. 677, 687; *Kelly v. Kelly*, 103 Md. 548, 554; *Whisner v. Whisner*, 122 Md. 195, 204; *McCutchen v. Gigous*, 150 Md. 79, 87. And all of the evidence must relate to the mental capacity of the testator on the date of execution of the will. *Davis v. Calvert*, 7 G & J. 269, 300; *Harris v. Hipsley*, 122 Md. 418, 430; *Kelley v. Stanton*, 141 Md. 380, 384; *Birchett v. Smith*, 150 Md. 369; *Scheller v. Schindel*, 153 Md. 547, 560-561.

Mr. Magness, after telling of his intimacy with the testator, of their almost daily contact, of the testator's increasing bodily infirmities, and one trifling incident of forgetfulness ten days after the execution of the will, was examined by

the court and testified as follows: "Q. You say that he was seventy-eight years of age? A. Yes, sir. Q. You have said that in the last days of his life he was getting very feeble physically. A. Yes, sir.—tottery. Q. Was that physical condition progressive? Did it gradually get a little worse the whole year before he died? (Objection—Exception) A. Yes, sir; I think so. (Witness said he saw testator every day; sometimes staid at his house.) Q. Was there any evidence of his mental condition keeping pace with his physical condition? A. Yes, sir, I noticed—I think it was in July or the first part of August." (Witness evidently was about to relate the canning incident hereafter referred to when interrupted by the question). "Q. The question is whether or not there was any mental deterioration—whether that was a sudden thing or whether it was due to the general deterioration of mind and body. You have said he was going down hill for a whole year before he died? A. Yes, sir. (Objection and exception.) Q. As far as you know—you don't need to go into details—was there any mental deterioration in a progressive way that corresponded to the physical deterioration? (Objection and exception.) A. About the first part of August— Q. Answer it yes or no. A. Yes, sir. Q. Without saying, in answer to this question whether or not Mr. Kimble was fully in his right mind, did you notice any change in his mental condition keeping pace with his physical condition? (Objection and exception.) A. At times. Q. Was there anything that happened to Mr. Kimble so far as you observed to produce that condition except old age and gradually going down hill? (Objection and exception.) A. No, sir." At this point in the examination we have all the evidence upon which the witness was asked, over objection, to express an opinion as to whether, on the 26th day of August, 1926, the testator was of "sound and disposing mind and capable of executing a valid deed or contract," so that we are here called upon, not only to consider the questions objected to, but whether the witness had first laid a sufficient foundation of fact for an expression of opinion on the testator's mental capacity or incapacity. *Brashears v. Orme,* 93 Md.

496

442, 448; *Berry Will Case,* 93 Md. 560, 580; *Whisner v. Whisner,* 122 Md. 195, 204; *Smith v. Shuppner,* 125 Md. 409, 417; *Coughlin v. Cuddy,* 128 Md. 76, 82; 1 *Wigmore on Evidence* (2nd Ed.), p. 117, sec. 1922.

It cannot be questioned that the specific facts and incidents shown in evidence up to this stage of the case are so trivial as not to warrant an expression of the witness' opinion of the mental condition of the testator, and that the foundation for such an opinion must rest upon the questions covered by exceptions nine to fifteen, and it is the opinion of this court that all of the questions were inadmissible. They were all leading, but not having been objected to on that ground, objections to them cannot be sustained for that reason. *Balto. & O. R. Co. v. Black,* 107 Md. 642, 653; *Iron Clad Mfg. Co. v. Stanfield,* 112 Md. 360, 386. They are objectionable, however, because they assume the fact that at some time in the last year of the life of the testator he became incompetent to make a will, and that from that point his mentally unfit condition became permanent and so continued to the date of the will. The witness had not related any facts or incidents from which an opinion of incapacity could be deduced, and he was not an attending physician, who could give his opinion without first stating the facts upon which it was founded (*Donnelly v. Donnelly,* 156 Md. 81), the value of whose opinion may be tested on cross-examination. *Jones v. Collins,* 94 Md. 403, 412; *Benesch & Sons v. Ferkler,* 153 Md. 680, 682. Advancing years and bodily infirmities alone do not render one unfit to make a will. As was said in *Birchett v. Smith,* 150 Md. 369, 376, quoting a prayer approved in *Higgins v. Carlton,* 28 Md. 115, 144, "The law looks only to the competency of the understanding, and neither age nor sickness, nor extreme distress, nor debility of body will affect the capacity to make a will if sufficient intelligence remain." *Berry Will Case,* 93 Md. 560, 584. The questions objected to, therefore, because they apply old age and debility of body as the measure or yardstick of mental capacity, should not have

been allowed in the absence of evidence of sufficient facts or incidents from which to draw such a conclusion.

But the witness himself gave evidence of the lack of permanency or continuity of the mental incapacity of the testator which the law requires where the evidence is not of the date of execution of the will. *Birchett v. Smith,* 150 Md. 369, 376; *Townshend v. Townshend,* 7 Gill, 10, 31. To repeat, the witness in answer to the question, "Did you notice any change in his mental condition keeping pace with his physical condition?" answered, "At times," and, further, that so far as he had observed, nothing had occurred "to produce that condition except old age and gradually going down hill." The witness did not testify to any facts concerning the testator from August 1st until the 6th of September. With the facts hereinbefore stated, the witness was permitted to testify to the testator's testamentary capacity (exception sixteen), to which he answered: "No, sir; I don't think he was capable of attending to any business. I think he was too old and feeble and absent-minded to do any business that amounted to anything—to enter into any contract or anything like that." (Motion to strike out answer overruled and exception seventeen.) Thereupon, being asked the question, "Give us some of the reasons you have for saying that Mr. Kimble was not able to execute a valid deed or contract at that time," Mr. Magness then testified that "Mr. Kimble was in poor health and was going down hill; as I stated before, for five or six years his age had been pulling him down and he would go from one subject to another. I know lots of times he was absent-minded. He would sit down to my house and tell me things over a dozen times when he felt like talking." He then told of one incident, "the latter part of July or the first part of August, 1926," the testator had been to witness' home in the morning; he went back "to his house and sat there on the porch smoking his pipe" until about two or three o'clock, when he came back to witness' house. "He came to the front door and banged on it and raised the devil. He said, 'I have been over to the Eastern Shore buying canned goods. I want to

begin canning and I want to buy canned goods.' (He had been a canner several years before.) That is as far as I understood it." * * * "We talked backwards and forwards and he gave me a whole rigmarole of stuff that had no sense in it." He stayed for supper, when witness said, "Uncle Robert, you had quite a spree today. You were over in Cecil County and all over the Eastern Shore buying canning houses and tomatoes. How many houses are you going to run this year? He says, 'I don't know a thing about it. I must have been out of my mind. I don't know a thing about it.' " Asked by the court whether he had been drinking, the witness said, "No, sir—where did he get anything to drink?"

This is the testimony upon which we are asked to declare that there was legally sufficient evidence of permanent insanity such as to leave to the jury the third issue as to whether or not, on August 26th, 1926, Robert E. Kimble was of sound and disposing mind and capable of executing a valid deed or contract.

The witness, Magness', opinion or conclusion of fact seems to have been based on age and physical infirmities, which we have already discussed, and on the canning "spree" or delusion of August 1st, and the appellees contend that we should accept these as sufficient evidences of permanent insanity from which incapacity on August 26th may be inferred. There was no evidence of any other queer or unusual conduct on the part of the testator, and, even if we accept the canning "spree" as a delusion, the will not having been shown to be a product of such delusion, we cannot draw an inference of permanent incapacity from it alone. *Gesell v. Baugher,* 100 Md. 686; *Jones v. Collins,* 94 Md. 414; *Brown v. Fidelity Trust Co.,* 126 Md. 175, 182; *Dreyer v. Welch,* 136 Md. 219, 224. Nor does the evidence show a general breaking down of the mental faculties, as in *Lawson v. Ward,* 153 Md. 93.

It, therefore, appearing to this court that there was no legally sufficient evidence of want of mental capacity in the testator on the day of the execution of the will, the appel-

lant's third prayer should have been granted, and the exception to the refusal of it will be sustained.

The appellant's fourth prayer, which was for a directed verdict for the caveatee on the fourth issue, should have been granted, and the exception to the refusal of it will be sustained. This prayer submitted the question as to whether the contents of the will of August 26th, 1926, were read to or by the testator and known and understood by him at or before its execution. The uncontradicted evidence is that, about a month before the excution of the will, the testator had spoken to Mr. Cronin about it, and the day before it was executed he gave him instructions to write it, told him what he wanted done with his property, and went back the following day to execute it, when the will was read to him. Mr. Cronin testified that in writing the will he had followed the testator's instructions "to the letter." The appellees' contention that the appellant's fourth prayer was properly refused is predicated on their contention of want of mental capacity at the date of its execution and the fact that it is a variation of his previous intention as expressed in the will of 1923. Inasmuch as we hold that there was no legally sufficient evidence of mental incapacity on the day of its execution, in the absence of any evidence that the testator did not know or understand the contents of his will of August 26th, 1926, the fourth issue should not have been submitted to the jury. *Grill v. O'Dell,* 113 Md. 625, 645; *Conrades v. Heller,* 119 Md. 448, 456; *Lyon v. Townsend,* 124 Md. 163, 190. And with this the other rulings on the prayers adverse to the appellant will be reversed.

Exception nineteen was taken on the refusal of the trial court to allow Cyrus C. Cronin to express an opinion of the testamentary capacity of the testator because the preliminary facts relied on were too remote in point of time. Mr. Cronin had known him intimately for many years, saw him daily when he was engaged in the canning business some years before; in the meantime he had not seen him very often but had seen him at least three times within a month of the execution of the will, and said that, while he had gotten older

500

and could not move about as he used to, he noticed no change in his mental condition. He was sufficiently qualified to express an opinion as to his decedent's testamentary capacity.

For the reasons stated, the rulings on exceptions one to eight will be affirmed, and all others reversed.

*Rulings affirmed in part and reversed in part, and case remanded.*