PATRICIA DIETRICH HESS ET AL. *v.* ANTOINETTE L. FRAZIER ET AL.

[No. 516, September Term, 1974.]

*Decided June 25, 1975.*

---

The cause was argued before MORTON, MOYLAN and MASON, JJ.

*Edward A. Palamara,* with whom were *Cohen, Fodiman, Palamara & Goldman* on the brief, for appellants — cross-appellees.

*Wilson K. Barnes* and *Clarence M. Thomas,* with whom

152

were *Savage, Jones, Tingle & Schwartzman, P.A.,* on the brief, for appellees — cross-appellants.

MOYLAN, J., delivered the opinion of the Court.

Helen Lee Dietrich died in Baltimore City on or about November 8, 1971, leaving a considerable estate. She died alone, not attended by any physician. On the night of the discovery of her remains by her son-in-law, there was also found her purported Last Will and Testament. This was turned over to the named executor. This purported Last Will was filed in the Orphans' Court for Baltimore City.

Surviving the testatrix were two daughters, Patricia Dietrich Hess and Helen Neal Dietrich Curley, the appellants in this case, and two grandchildren, Mark Hess and Lisa Hess, children of the appellant Patricia Dietrich Hess. Also surviving the testatrix were her two sisters, Antoinette L. Frazier and Rita V. Chalmers, and a brother, William Edward Smith (all of whom are the appellees herein along with the executor, Francis X. McDonough). The Last Will and Testament in question essentially divided the estate into five equal parts, with one-fifth going to each of the testatrix's two daughters, two sisters and brother. Immediately upon the filing of this will in the Orphans' Court, the appellants filed their Petition for Caveat.

Four agreed-upon issues were certified for jury trial to the Superior Court of Baltimore City. The issues to be determined by the jury were as follows:

"1. Was the decedent, at the time of the execution of said Instrument, of sound and disposing mind and competent to make a Will?

2. Was the Will, purported to be executed by the decedent, procured by undue influence, exercised and practiced upon her?

3. Was the Will, purported to be executed by the decedent, procured by fraud exercised and practiced upon her?

4. Was the contents of said Will read by the

decedent or read to her or otherwise explained to her before the execution of said Instrument?"

A jury trial on the certified issues was conducted in the Superior Court from February 6, 1973, through March 1, 1973, Judge James A. Perrott presiding. At the close of the appellees' case, the court directed a verdict in favor of the appellees on issues 2, 3 and 4. The first issue went to the jury, which decided that the decedent was not competent at the time she executed her Last Will and Testament on December 12, 1968. On March 29, 1974, on motion duly made, Judge Perrott granted a Judgment Non Obstante Verdicto in favor of the appellees on the first issue. On this appeal, the appellants raise two contentions:

(1) That the trial court erred in granting the Motion for Judgment N.O.V.; and

(2) That the trial court erred in granting the Motion for Directed Verdict on the second issue.

The appellees have also filed a cross-appeal in which they charge that seven erroneous and harmful rulings were made against them during the course of the trial — in one case involving the failure to charge the jury and in six other cases involving the admission of and refusal to strike certain testimony.

We will consider first the granting of the directed verdict in favor of the appellees on the second issue, which was whether the will was "procured by undue influence."

The appellants do not contend that the decedent's sisters or brothers exercised any undue influence upon her. Indeed, the evidence revealed that they had had little contact with her during the months and years prior to her death and were pleasantly surprised to have been significant legatees under her will. The appellants direct their focus at the appellee-attorney, Francis McDonough, who prepared the will. Even taking the testimony, and all reasonable inferences drawable therefrom, in the light most favorable to the appellants, there is no evidence suggesting any undue

154

influence practiced upon the decedent by her attorney. The decedent had prepared, through another attorney, an earlier will in October, 1968. In that earlier version, she had left each of her daughters the sum of $1. After advising with Mr. McDonough, the decedent changed this provision in the December 12, 1968, will. Indeed, a bequest to Mr. McDonough himself in the proposed October, 1968, will was not carried forward into the December 12, 1968, will. In his initial draft of the new will, moreover, Mr. McDonough had provided for each daughter to receive a cash bequest. Mrs. Dietrich eliminated this provision, necessitating a redraft of the proposed will. Mr. McDonough was not present when the will was executed. He testified further that Mrs. Dietrich was a strong-willed woman and a shrewd business woman, not easily influenced.

A key portion of Mr. McDonough's testimony, relied upon by the appellants, is indeed adverse to their cause:

> "I indicated to Helen Lee Dietrich that that will was susceptible to attack. I told her it would be better to include her daughters in the will. It was up to me to tell her that. I am accused of using undue influence. If I would have convinced the lady to leave the estate to the two daughters, they wouldn't have this caveat, but that is how much influence I had. But Helen Dietrich was a practical business woman. When I explained to her that the will would be caveated, the will that Bill McDonald drew, possibly, and she asked, what happened in a caveat case. I said, well, normally the party makes some sort of a compromise, the party that has been left the estate makes some compromise with the caveators, especially if the caveators are the children. She said, 'You mean they split it to a fifth?' I said, yes. It was under those circumstances she decided to give them each a fifth."

The appellants' position that the will was an "unnatural will" does not hold up under analysis. Mrs. Dietrich's two daughters each received a one-fifth interest in her estate.

They were neither disinherited nor ignored, even though the evidence established some estrangement between mother and daughters in the few years preceding her death. She was displeased that they had apparently "sided" with their father during a period of marital difficulty between Mrs. Dietrich and her former husband. Nor did Mrs. Dietrich bequeath even the remaining three-fifths of the estate to strangers. Her two sisters and her brother were normal "objects of one's bounty." The decedent's sister Mrs. Frazier had taken trips with Mrs. Dietrich and was the one who had come up from Ocean City to assist Mrs. Dietrich in leaving Springfield State Hospital. The disposition of the estate was in no way "unnatural" or indicative of any lack of capacity to make such disposition. *Shearer v. Healy,* 247 Md. 11, 25-26, 230 A. 2d 101 (1967).

Nor is there any proof whatsoever of undue influence over Mrs. Dietrich on the part of Mr. McDonough. The Maryland law in this regard is clear. In *Shearer v. Healy, supra,* the Court of Appeals stated at 247 Md. 23:

> "The Maryland law in regard to the required proof to establish undue influence vitiating a will was well stated by Judge (now Chief Judge) Hammond, for the Court, in *Stockslager v. Hartle,* 200 Md. 544, 547, 92 A. 2d 363 (1952), as follows:
>
>> "* * * [U]ndue influence which will avoid a will must be unlawful on account of the manner and motive of its exertion, and *must be exerted to such a degree as to amount to force or coercion,* so that free agency of the testator is destroyed. The proof must be satisfactory *that the will was obtained by this coercion* (although it need not be immediately exercised as of the date of the execution of the will if its influence causes its execution) or by importunities which could not be resisted, so that *the motive for the execution was tantamount to force or fear. Mere suspicion that a will has been procured by undue*

*influence, or that a person had the 'power unduly to overbear the will of the testator' is not enough.* It must appear that the power was *actually exercised,* and that *its exercise produced the will.* The *burden of proof is on the caveator to meet these requirements of the law.'* (Emphasis supplied)

The Court in *Stockslager* cited with approval and followed *Koppal v. Soules,* 189 Md. 346, 56 A. 2d 48 (1947). See also *Layman v. Conrey,* 60 Md. 286 (1883)."

See *Sachs v. Little,* 245 Md. 343, 371-372, 226 A. 2d 283 (1967); *Ingalls v. Trustees,* 244 Md. 243, 268-270, 223 A. 2d 778, 791-792 (1966); *Treffinger v. Sterling,* 269 Md. 356, 363, 305 A. 2d 829 (1973).

There was simply no evidence in this case that any undue influence was exercised by Mr. McDonough over the testatrix. The trial judge was not in error in directing a verdict in favor of the appellees on this issue.

The more significant controversy is over the question of whether the trial judge was in error when he granted the Motion for Judgment N.O.V. in favor of the appellees — reversing the verdict of the jury and finding that Helen Lee Dietrich was "of sound and disposing mind and competent to make a will" as of December 12, 1968. Focusing almost exclusively on this single salient issue, the trial consumed fourteen court days and produced 1550 pages of transcribed testimony. Approximately 30 witnesses were called, including seven doctors. Numerous physical exhibits were introduced.

The thrust of all of the evidence was to the effect that Helen Lee Dietrich was at the time of her death, and had been for many years before, an alcoholic. At issue was the effect of this alcoholism upon her testamentary capacity.

The legal standard against which the sufficiency of the evidence to create a jury issue will be reviewed was well set out by Judge Singley for the Court of Appeals in *Webster v. Larmore,* 268 Md. 153, 157-158, 299 A. 2d 814, 816-817 (1973):

"We restated the rule of the cases, speaking through Judge Horney, in *Arbogast, Executor v. MacMillan*, 221 Md. 516, 525, 158 A. 2d 97 (1960):

'It is true, of course, that evidence tending to prove competency in general may relate to the entire period of acquaintance of a witness with a testator both before and after the date of the making of a will. *Jones v. Collins*, 94 Md. 403, 411, 51 A. 398, 400 (1902); *Harris v. Hipsley*, 122 Md. 418, 435, 89 A. 852, 857 (1914). But evidence produced to show lack of testamentary capacity must relate to the mental condition of the testator at the time the will was executed.'

This is the logical consequence of the presumption of testamentary capacity, stated in the same opinion, 221 Md. at 523:

'The law presumes that every man is sane and has capacity to make a valid will, and the burden of proving the contrary rests upon those who allege that he lacked mental capacity. *Cronin v. Kimble*, 156 Md. 489, 494, 144 A. 698, 700 (1929); *Smith v. Shuppner*, 125 Md. 409, 417, 93 A. 514, 517 (1915). Moreover, in the absence of proof of prior permanent insanity, it must be shown that the testator was of unsound mind at the time the will was executed in order to overcome the presumption of sanity. *Acker v. Acker*, 172 Md. 477, 192 A. 327 (1937); *Gesell v. Baugher*, 100 Md. 677, 60 A. 481 (1905).'

See also *Waple v. Hall*, 248 Md. 642, 657-58, 238 A. 2d 544 (1968); *Ingalls v. Trustees*, 244 Md. 243, 260, 223 A. 2d 778 (1966)."

Although numerous witnesses testified for the appellant as to the deleterious effect of the alcoholism upon the health of Helen Lee Dietrich, a review of that testimony reveals

that none gave evidence as to a specific lack of testamentary capacity on December 12, 1968, and, with one possible exception to be discussed more fully hereinafter, none gave evidence as to prior permanent insanity.

Dr. John H. Hirshfeld treated Mrs. Dietrich in December, 1967, for alcoholism and had her committed to Encore House. He diagnosed her condition as acute intoxication and chronic alcoholism. He testified that she was a chronic alcoholic and that each bout of alcoholism caused irreversible brain damage. He also testified, however, that "There are alcoholics that can still function and hold a job;" that he could not say that Mrs. Dietrich, when he saw her in December, 1967, "was permanently insane;" and that he had no knowledge of Mrs. Dietrich's condition on December 12, 1968.

Dr. Edwin B. Jarrett saw Mrs. Dietrich in 1959 and again in 1964, on which latter occasion he treated her at the Union Memorial Hospital for drug poisoning (possibly suicidal). He testified that Mrs. Dietrich had "quite a checkered psychosomatic career." He clarified this characterization by saying that he meant that "she had good times as well as bad times." He testified further that when he last saw her in May, 1964, Mrs. Dietrich was "not insane."

Dr. Francis X. Carmody testified that he treated Mrs. Dietrich at the Union Memorial Hospital in 1968. She was in the hospital for several days and was his patient for approximately one year. At the time of her admission, she was intoxicated and was suffering from withdrawal syndrome from alcohol intoxication. She had, moreover, cirrhosis of the liver. Dr. Carmody also testified, however, that when Mrs. Dietrich was not intoxicated, she "was a very cordial and friendly ... woman. It was a striking difference in her behavior." He testified that when he last saw Mrs. Dietrich in June, 1968, "She was not intoxicated and was very cooperative and pleasant. I don't think I saw her after that." He testified that when Mrs. Dietrich visited his office after her discharge from the hospital, "she could make a contract and have a general idea or have an idea what she was doing, just like you and I would." He testified

that throughout his course of treatment of Mrs. Dietrich he "had never thought of Mrs. Dietrich as being permanently insane . . ."

Dr. Lester H. L. Kolman had treated Mrs. Dietrich in February, 1968, for delirium tremens as well as other symptoms of alcoholism. He did not think that she was mentally clear at all times, even without alcohol. He also testified, however, that "if she would stay off alcohol and with some care, her condition would improve." He indicated that the medical records on February 1, 1968, indicated, in part, that Mrs. Dietrich was "mentally alert, ambulatory, feeds herself." He testified that he never saw Mrs. Dietrich after February, 1968.

Dr. Teresa M. Boria testified that she treated Mrs. Dietrich for a three-day period at the Seton Institute beginning on May 10, 1968. Although her diagnosis included "some mental illness," "suicidal thinking," "a history of depression," and a reluctance "to accept treatment," Dr. Boria's opinion was that at the time of Mrs. Dietrich's discharge from Seton Institute against medical advice that her degree of psychiatric impairment was moderate. Dr. Boria testified that she meant by this that the psychiatric illness "somehow interfered with normal functions of life between 30 and 50 percent reduction." Dr. Boria stated that "in cases of depression, which involve alcoholism . . . it was possible that in the absence of alcohol, there could be times when there was no depression." Dr. Boria also stated that after Mrs. Dietrich's stay at Seton, "her mind was clear."

Dr. Irving Taylor testified that Mrs. Dietrich was a Patient at Taylor Manor beginning on October 15, 1959. She was depressed on admission. Mrs. Dietrich left Taylor Manor against the doctor's advice. He stated that the "prognosis was guarded." Dr. Taylor testified as to Mrs. Dietrich's competence to execute a valid deed or contract in the following inconclusive fashion:

"Q. Doctor, isn't it possible in your opinion that, after the electroshock therapy wore off, that Mrs. Helen Lee Dietrich, who was your patient could

160

have had periods when she was competent to make valid deeds or contracts?

          * * *

A. *I don't know.* This would depend on a number of factors. How much more she drank; what her basic condition was after the depression, the effects of the treatment, and the acute intoxication; all three of those things disappeared.

Q. A combination of the circumstances could occur, that could occur to make this circumstance possible?

A. *I don't know.*" (Emphasis supplied)

Dr. Taylor further testified that when Mrs. Dietrich left Taylor Manor in October, 1959, when he saw her, she "certainly was competent."

The lay witnesses did not in any fashion establish that Mrs. Dietrich was either 1) testamentarily incompetent as of December 12, 1968, or 2) permanently insane. George Dietrich, her former husband, testified that he and his wife had run a family-operated realty office for a number of years. They separated in 1965. Subsequent to the separation, Mr. Dietrich filed suit against Mrs. Dietrich, seeking an equal interest in the realty business. The appellant Patricia Hess left the home to be married in 1956. The appellant Helen Lee Dietrich Curley left home to take her own apartment in 1964. Mr. and Mrs. Dietrich were divorced in 1969. It was Mrs. Dietrich who filed suit against her husband for the divorce. Mr. Dietrich testified that when Mrs. Dietrich was not drinking, she was competent to operate her real estate business. Mr. and Mrs. Dietrich executed a settlement agreement, under which Mr. Dietrich was to receive $37,500, on November 20, 1968 — 22 days prior to the execution of the will now in question on December 12, 1968. The appellant Helen Lee Dietrich Curley testified that she left home in 1964 because of her mother's drinking. She testified further, however, that when her mother was not drinking, "she was just like a normal mother."

William F. McDonald, Esq., was the attorney for Mrs. Dietrich during the time that she was defending against her husband's claim for part of the realty business. He also prepared a will for her. He believes that it was signed on October 21, 1968. He testified that as of the time of the settlement with her husband, in November, 1968, Mrs. Dietrich was not under the influence of alcohol. Mr. McDonald testified that when he prepared the will for Mrs. Dietrich in October, 1968, she knew her assets, "I'd say she knew everything she had." He stated that he had spent "many, many hours on several occasions" with Mrs. Dietrich discussing her business operations. He considered her to be a "very shrewd business woman." He testified that at the time of the settlement with her former husband, "she seemed perfectly normal to me on that occasion." He stated that on November 20, 1968, when the settlement agreement was executed by Mrs. Dietrich, there was "no question in my mind but that she knew exactly what she was doing." He stated that no one raised "any question as to her competency to sign the agreement."

Jerome Hess, Mrs. Dietrich's son-in-law, testified as to Mrs. Dietrich's chronic alcoholism. He acknowledged, however, that there were occasions when she was not intoxicated and that on these occasions, "she appeared to be all right."

Ewalt P. Brunn, a subscribing witness to the will, testified that Mrs. Dietrich was competent and capable of making a valid deed or contract. Mr. Brunn was the Manager of the Hamilton Branch of the Union Trust Company and had known and dealt with Mrs. Dietrich for 20 years. There was no doubt in his mind as to Mrs. Dietrich's ability to enter into contracts or to execute deeds at the time she came in to sign the will.

Mrs. Catherine Kurad, the other subscribing witness to the will, was the Assistant Manager of the Hamilton Branch of the Union Trust Company. She had done business with Mrs. Dietrich for a number of years prior to the execution of the will and continued to transact business with Mrs. Dietrich for three years after the will was signed. She was of

the opinion that Mrs. Dietrich was competent to make a valid deed or contract and was "perfectly sane." The appellants also called the appellees Antoinette L. Frazier and William E. Smith. Their testimony was unremarkable. Mrs. Frazier had accompanied Mrs. Dietrich on three cruises between 1964 and 1970.

The critical testimony as to December 12, 1968, came from Francis X. McDonough, Esq., who prepared the will in question. He had known Mrs. Dietrich for approximately 25 years, primarily through handling real estate settlements for her. He knew of her periodic hospitalization for alcoholism. Significantly, he testified that Mrs. Dietrich furnished him with a list of properties on the day that she executed the will and also with a list of her cash assets. He advised her as to the possible outcome in the event that a caveat should be filed against the will which she had prepared two months earlier. He testified:

"A. It was for that reason she drew this new will and tried to avoid a caveat, and give each one a fifth.

Q. What made her change her mind to cut off the other legal heirs in the first will?

A. I have no idea. I didn't go into that with her. She was a very strong-willed professional business woman, and nobody influenced Helen Lee Dietrich, I assure you of that."

Two days before executing the final draft of the will, Mrs. Dietrich changed her mind about proposed cash bequests to her daughters and stated, "I don't want to make any cash bequests to my daughters. I want to treat them all alike, my brother, my sisters and two daughters." Mr. McDonough testified unequivocally that Mrs. Dietrich had the capacity to execute a valid deed or contract when he drafted her will, "that she had definite testamentary capacity," that "she was competent and there wasn't a thing wrong with her mentally."

All of the foregoing witnesses were called by the

appellants. The list of witnesses called by the appellees to testify to the business acumen of Mrs. Dietrich both before and after December, 1968, was impressive.

Albert E. Schaible was a certified public accountant who had worked for Mrs. Dietrich and prepared her tax returns since 1947. He saw her eight times a year and testified as to the meticulousness with which she kept and marked all deposit slips indicating whether it was on a special receipt or an escrow receipt, marking the property on which the money was received, and marking commissions. He regularly discussed the tax returns in detail with Mrs. Dietrich before filing them. Mrs. Dietrich "never appeared to be intoxicated" in the office. She always "appeared to me as a very shrewd, competent business woman."

Alberta M. Primus testified that in August, 1968, she spent several weekends with Mrs. Dietrich as Mrs. Dietrich was looking for a new house for her. She ultimately purchased a house through Mrs. Dietrich. David Wiegman testified that he worked for Mrs. Dietrich as an associate broker between mid-1970 and mid-1971. Mrs. Dietrich was active in the business and was involved in every unit sale that went through her office. She was never intoxicated in the presence of Mr. Wiegman.

Melvin J. Sykes, Esq., represented Mr. Dietrich during his litigation with Mrs. Dietrich. He remembered taking Mrs. Dietrich's deposition on March 5, 1968. He testified that she was responsive to his questions, was attentive and attempted to answer or dodge them.

Robert L. Johnson, a bank manager, testified to business dealings with Mrs. Dietrich from May, 1968, through January, 1970. He never saw her intoxicated or unable to transact business.

Rev. Ewalt Gorenflo testified that in September, 1968, he purchased a home through Mrs. Dietrich. Over three weekends, she showed him twelve to fourteen houses. She assisted him with the financing of the purchase by arranging a loan with a savings and loan association. She explained to him the concept of a "ground rent" in Maryland.

Luther J. Wolf, a trust officer with the Union Trust Company, testified that he discussed Mrs. Dietrich's estate with her in April, 1969. He had a copy of her Last Will but major emphasis in the discussion was on the investment program. She was "neat and attractive" and gave no indication of having been drinking. Her discussion was astute and completely professional.

Various business records prepared by or in consultation with Mrs. Dietrich were introduced into evidence.

In terms of the propriety of the Judgment N.O.V., the nub of the case is the testimony of Dr. James S. Wright. Dr. Wright had treated Mrs. Dietrich at the Seton Institute in November, 1959. That was the last time that he had seen her and, as a result, he could not testify specifically and directly as to her testamentary capacity on December 12, 1968, nine years later. On that issue, it is clear that there was not sufficient evidence to go to the jury and that the trial judge was correct in granting the Judgment N.O.V. Dr. Wright also testified, however, as an expert witness who sat throughout the trial, hearing all of the testimony, and offering an ultimate conclusion based upon the sum total of that testimony as well as his own earlier personal observations. The critical testimony of Dr. Wright was to the effect that Mrs. Dietrich's judgment on December 12, 1968, was impaired on a permanent basis, especially as it related to her relationship to her relatives. He diagnosed her condition as alcoholic deterioration, physically affecting the frontal lobes of the brain. He testified that this was a permanent condition which could not be reversed. He testified that Mrs. Dietrich could not exercise "the same degree of judgment, cannot make complicated decisions concerning ethical and moral standards or one's responsibility to people."

The appellees, on cross-examination, sought to probe the meaning of Dr. Wright's testimony. Dr. Wright did testify that "there was no gross impairment of memory" and that there was "no evidence of actual delusions or hallucinations, what we understand as psychotic, certain types of psychotic symptoms, no evidence of these being present." He

summarized his statement as to Mrs. Dietrich's mental state as follows:

> ". . . this lady had been behaving irrationally, had been depending heavily on the use of alcohol in order to function and was exercising . . . poor judgment in the exercise of her affairs in that her judgment was impaired, especially insofar as it relates to her relationship to her relatives. That would conclude my summary of her mental state."

He testified ultimately that the "alcoholic deterioration" of Mrs. Dietrich was a "permanent condition" but he did not say that Mrs. Dietrich was permanently insane. He further went on:

> "Q. . . . But you would agree then that there are certain circumstances and certain conditions that would prevail where she would be capable of executing a valid deed or contract?
>
> . . . .
>
> A. If the conditions were such that it was a relatively simple decision and did not involve a lot of foresight, a lot of judgment, yes."

The ultimate test in this regard, which was correctly applied by the trial court, is that stated in *Cronin v. Kimble,* 156 Md. 489, 494, 144 A. 698 (1929):

> "The presumption of law being in favor of sanity and testamentary capacity, the evidence to support a caveat on the issue of insanity must ordinarily tend to show either that the testator was of unsound mind at the time of the execution of the will, or that he was affected with permanent insanity prior to the execution."

*Cronin* was cited with approval in *Arbogast v. MacMillan,* 221 Md. 516, 523, 158 A. 2d 97, 101 (1960). In *Arbogast,* Judge Horney said for the Court of Appeals:

> ". . . Moreover, *in the absence of proof of prior*

*permanent insanity,* it must be shown that the testator was of unsound mind at the time the will was executed in order to overcome the presumption of sanity. *Acker v. Acker,* 172 Md. 477, 192 Atl. 327 (1937); *Gesell v. Baugher,* 100 Md. 677, 60 Atl. 481 (1905)." (Emphasis supplied)

And see *Benjamin v. Woodring,* 268 Md. 593, 611, 303 A. 2d 779, 789 (1973).

We agree with the trial judge that the ultimate thrust of Dr. Wright's testimony was not to the effect that Mrs. Dietrich was permanently insane so as to lack testamentary capacity. His statements as to permanency were directed to the subject of brain damage resulting from the long-term abuse of alcohol. He testified that this did *affect* her capacity to make a will, but not that it totally vitiated such capacity. His critical testimony in this regard was:

"Q. And you are prepared to say, without having seen this patient since 1959, that she was permanently insane?

A. I have already said that I am prepared to say she had brain damage; that this affected her capacity to form judgments, and that this would affect her capacity to make a will. This is what I was questioned about. In my opinion, it would also affect her capacity to carry out other activities."

The court questioned Dr. Wright in an effort to learn the basis for his conclusion and to clarify the meaning of that conclusion. It is clear that the sum total added up to less than permanent insanity amounting to lack of testamentary capacity:

" THE COURT: Doctor, you just tell us the basis for the statement you are now making. Whether it need be one day or whether it need be a series of days, is something we can't answer. That is up to you.

THE WITNESS: Well, her behavior would consist of drinking alcohol heavily at times, fairly

continuously. This, in my opinion, would affect her judgment and, in my opinion, there is evidence that her judgment is impaired on a permanent basis at this time. I will just give you a summary of the mental state and then, if you wish me to elaborate upon what I base the opinions on, I will do that.

I will say that her behavior has been erratic and consisting of drinking alcohol, of not attending to regular modes of behavior and I would say that she would not be able to exercise good judgment, especially in evaluating the responsibility and the type of relationship she has with various relatives and the type of responsibility she would have towards them. Concerning her memory, I would say that there was no evidence of gross impairment of the memory. There was no evidence of actual delusions or hallucinations, what we usually understand as psychotic, certain types of psychotic symptoms, no evidence of these being present.

I would summarize my mental state — my statement as to her mental state as being that this lady had been behaving erratically, had been depending heavily upon the use of alcohol in order to function, and was exercising poor memory — excuse me, I correct that — was exercising poor judgment in the exercise of her affairs, in that her judgment was impaired, especially insofar as it relates to her relationship to her relatives. That would conclude my summary of the mental state."

In his Memorandum Opinion granting the appellees' Motion for Judgment N.O.V., Judge Perrott zeroed in on the testimony of Dr. Wright and ultimately concluded:

"Herein the plaintiffs called a number of witnesses in an attempt to establish the purported incompetency of the testatrix; however, the testimony of those individuals was of insufficient probative value to surmount the presumption of sanity, and conjointly proper testamentary

capacity, on the part of the decedent. Among those so called to testify for the plaintiff was Dr. James S. Wright, who was present throughout the case, heard all of the testimony rendered, and subsequently offered his expert opinion, based on supposition, as to the mental condition of the testatrix, Helen Lee Dietrich. However, Dr. Wright's testimony taken 'in toto' tended to reinforce the presumption of the testatrix's mental competency, rather than to prove her incapacity. The transcript of Dr. Wright's testimony in this matter amply elucidates his opinion of the mental competency of the decedent on the crucial date of December 12, 1968, as inscribed on pages 46, 47 and 48, as follows:

'Q. (By Mr. Thomas) All right. Now, would she be, in your opinion, capable of purchasing a piece of unimproved ground, again speaking about that date or forward?

A. Well, it's difficult for me to know exactly —

THE COURT: Excuse me, Mr. Thomas. I don't want to interrupt you, but are you aware that you said, 'Would she be capable of purchasing'? Are you changing your line of questioning?

MR. THOMAS: No, sir. I am referring specifically to the same thing I was asking before. I would include with that, purchasing or selling.

THE COURT: All right.

MR. THOMAS: That was the intent of the question.

A. It is difficult for me to answer that just yes or no because I am not familiar in detail with the real estate business and I can only say, on the same principles that I used before, that any transaction needing a great deal of judgment and a great deal of foresight and attention to

many, many complex variables, I would not consider her capable of making. If it is a simpler transaction, where it is not as complex, then possibly she could. But it is difficult for me to say, when you just say 'unimproved ground' because I really don't know how many complex factors and how much foresight a person would need to make this transaction.

Q. All right, Doctor. But you would agree then that there are certain circumstances and certain conditions that would prevail where she would be capable of executing a valid deed or contract?

MR. PALAMARA: Objection.

THE COURT: Overruled.

Q. (By Mr. Thomas) — from that day forward?

A. If the conditions were such that it was a relatively simple decision and did not involve a lot of foresight, a lot of judgment, yes.'

\* \* \*

Therefore, this court finds that the testatrix, Helen Lee Dietrich, was of sound and disposing mind and capable of executing a valid deed or contract at the time when she executed her testamentary document . . . ."

We hold that he was correct in making the Judgment N.O.V. and that there was, therefore, no error. In reviewing the granting of the Motions for a Directed Verdict and Judgment N.O.V., we have assumed the truth of all credible evidence and all inferences fairly deducible therefrom and have considered them in the light most favorable to the appellants, the parties against whom the motions were made. *Gill v. Computer Equipment Corp.*, 266 Md. 170, 173, 292 A. 2d 54 (1972); *Lusby v. First National Bank*, 263 Md. 492, 499, 283 A. 2d 570 (1971); *Buchanan v. Galliher*, 11 Md. App. 83, 87-88, 272 A. 2d 814 (1971); *Miller v. Michalek*, 13 Md. App. 16, 17-18, 281 A. 2d 117 (1971); *Burns v. Goynes*, 15

Md. App. 293, 301, 290 A. 2d 165 (1972); *Moran v. Williams*, 19 Md. App. 546, 551-552, 313 A. 2d 527 (1974); *Montgomery Ward & Co. v. McFarland*, 21 Md. App. 501, 319 A. 2d 824 (1974).

In view of our disposition of the appeal in favor of the appellees on these grounds, it is unnecessary to deal with the contentions raised by them in their capacity as cross-appellants.

Although it does not affect the outcome of the appeal, we will grant the appellees' Motion to Correct the Record. The issues in this case had been framed in the Orphans' Court of Baltimore City and sent to the Superior Court for determination by a jury. The verdict of the jury upon the critical first issue was, "No." The clerk of the Superior Court erroneously placed the following entry in the docket of that court:

> "29 Mar. 74 — Judgment Absolute in favor of the Defendants for cost of suit."

The appellants took this appeal prior to the certification of the answers to the issues to the Orphans' Court of Baltimore City. As was made clear by the Court of Appeals in *Syfer v. Dolby*, 182 Md. 139, 152, 32 A. 2d 529 (1943):

> "A court of law does not enter a judgment in cases involving issues sent to it for trial by an orphans' court."

The docket entries should be corrected to read:

> 29 March 74 — Motion for Judgment N.O.V. Granted, Verdict of the Jury on Issue 1, stricken, Verdict upon the Issue is "Yes" by direction of the Court.

The docket entries should also be amended to add the following:

> 28 Feb. 73 — Defendants' Motions for Directed Verdict in regard to Issues 2, 3 and 4 granted and verdicts of "No" as to Issue 2, "No" as to Issue 3 and

"Yes" as to Issue 4, entered by direction of the Court.

*Judgment affirmed; costs to be paid by appellants.*