WAPLE, ET AL. *v.* HALL, ET AL.

[No. 656, September Term, 1966.]

644

*Decided February 8, 1968.*

The cause was argued before HAMMOND, C. J., and HORNEY, MARBURY, BARNES, FINAN and SINGLEY, JJ.

*Hyman Ginsberg,* with whom were *Ginsberg & Ginsberg, Edward P. Camus* and *Faust C. Villareale* on the brief, for appellants.

*Joseph S. Cullins, Jr.,* with whom was *Morris Topf* on the brief, for appellees.

BARNES, J., delivered the opinion of the Court.

The will of Rosa Degenhardt (Rosa or testatrix), a widow, executed by the testatrix on March 17, 1964, admitted to probate on January 8, 1965, following the death of the testatrix on November 19, 1964, was challenged in the Orphans' Court for Prince George's County by a caveat filed on February 4, 1965, by her sister, Frances Pert Fox (Pert), her niece, Ann F. Fillmann (Ann) and her niece, Flora Belle Hall (Flora Belle). The caveatees, Frederick Waple, Sr. (Fred), a nephew of the testatrix, and Faust C. Villareale, a member of the Bar of Maryland, were the named executors in Rosa's will.

Eight issues were duly framed by the Orphans' Court for trial before a jury in the Circuit Court for Prince George's County. The Circuit Court (Parker, J.) directed a verdict either at the end of the caveators' case or at the end of the entire case on all of the issues except three, which challenged the will for undue influence, lack of mental capacity and fraud. The trial court overruled the motion of the caveatees for a directed verdict in regard to these issues, submitted them to the jury with instructions, and the jury answered the issues in favor of the caveators, i.e., that the will was executed when Rosa was not mentally capable, the will was procured by the exercise of undue influence practiced upon her and the will was procured by fraud. The caveatees filed a motion for a judgment *non obstante veredicto,* or in the alternative, for a new trial, which was over-

ruled by the trial court on July 28, 1966. This appeal by the caveatees duly followed.

The caveatees, as appellants, present five questions to us. The first three, which are the most important ones, are as follows:

Viewing the evidence in the case in the light most favorable to the caveators—

1. Was the evidence legally sufficient to be submitted to the jury on the issue of mental capacity?

2. Was the evidence legally sufficient to be submitted to the jury on the issue of undue influence?

3. Was the evidence legally sufficient to be submitted to the jury on the issue of fraud?

The remaining two issues present issues in regard to certain evidence, i.e., whether the trial court erred in not ruling that Dr. William D. Rosson was not qualified to express an opinion in regard to Rosa's competency and whether the trial court should have excluded evidence pertaining to certain alleged conduct at a nursing home some seven months after the will was executed. We do not find it necessary to rule upon these last two issues in regard to the evidence in that, assuming, *arguendo,* that the trial court ruled properly in regard to the challenged evidence, we are of the opinion that there was no evidence in the case, including the challenged evidence, legally· sufficient to submit the issues of mental capacity, undue influence and fraud to the jury. We will reverse the lower court.

The trial was a protracted one involving the testimony of twenty-four witnesses and many documentary exhibits. Although much of the testimony is not contradicted, there are some conflicts in the testimony, which will be resolved in favor of the caveators for the purposes of this appeal. As we said in *Ingalls v. Trustees,* 244 Md. 243, 247, 223 A. 2d 778, 779 (1966):

> "In considering the facts, all conflicts in the evidence must be resolved in favor of the caveators and the Court must assume the truth of the evidence produced on their behalf as well as all reasonable inferences in favor of the caveators that may be drawn from the evidence. *Tufts v. Poore,* 219 Md. 1, 8, 147

A.2d 717, 721 (1959). See also *Smith v. Bernfeld,* 226 Md. 400, 405, 174 A.2d 53, 55 (1961)."

Rosa was 87 years of age when her husband died on August 14, 1959, while they were living in Pleasantville, New York. She suffered from a disabling type of arthritis which made the use of a walker necessary. She also suffered from arteriosclerosis and from impaired hearing and vision. Her husband had suffered a heart attack in May prior to his death from cancer, and, at Rosa's request, Pert, one of Rosa's sisters, aged 79, closed her apartment in New Jersey and moved into Rosa's household where she continued to live and take care of Rosa for approximately three years after the death of Rosa's husband. In addition to her sister Pert, Rosa's only next of kin at the time of her husband's death was her sister Lillie Waple (Lillie), age 74, whose health was poor and who lived with her daughter Ann and Ann's husband Frank Fillmann (Frank) in Prince George's County, Maryland. During the three year period subsequent to the death of Rosa's husband, her sister Pert did much of the housework and cooking in addition to nursing Rosa without outside help. A woman came in to get breakfast and dress Rosa in the morning and in the evening to undress Rosa and put her to bed. Lillie went to New York in 1962 to relieve Pert so that Pert could take a short rest. After this short vacation, following a family conference, Flora Belle and Ann in July, 1962, arranged to move Rosa and Pert from New York to Maryland. Rosa went to live with Ann, with whom Lillie was already living, and Pert moved into the home of Flora Belle.

Although the owner of property worth approximately $150,-000, Rosa was very frugal indeed. When she moved into the home of Ann and Frank she obtained an agreement that she would pay $25 a week for her room and board. Rosa demanded special care and attention and insisted on special foods and wines. She was most attentive to her financial affairs, kept up with the value of her securities by reading the Wall Street Journal, and from time to time made wills disposing of her property. Pert testified that from May, 1959, until July, 1962, Rosa had executed four wills. In the latter part of 1962, after she had

moved into Ann's home in July, 1962, Rosa requested that the attorney who represented her when she resided in New York, William F. Osterhoudt, come to see her and prepare a new will. This was done and Rosa executed the will thus prepared. On April 4, 1963, Mr. Osterhoudt again came to Maryland, with his secretary, to see Rosa at the Fillmann home, prepared a new will for her which she executed with Mr. Osterhoudt's secretary, Ethel Trippitelli, as a witness with Agnes M. Keener. In this will of April 4, 1963, consisting of twenty-seven separate items, Rosa provided for seventeen cash legacies, including $10,000 to her sister, Lillie, $10,000 to her nephew Fred, $1,000 to her sister Pert, $10,000 to Frank and Ann in equal shares, $5,000 to her attorney, Mr. Osterhoudt and $5,000 to The Methodist Church of Pleasantville, New York. The residue was bequeathed to Lillie, Frank and Ann in equal shares or all to the survivor or survivors. Frank was the named executor with Ann as the alternative named executrix if Frank were unable to act as executor. There was an *in terrorem* clause revoking legacies to any legatees attacking the will directly or indirectly and a provision that if the estate was insufficient to pay all legatees, the legacies to relatives should first be paid, then those to individuals and finally those to corporations or institutions.

After Rosa left the Fillmann home and lived at the home of the Waples, she executed three wills; one on June 14, 1963, one on November 7, 1963, and the last will, admitted to probate and challenged in this case, on March 14, 1964. A proposed un-executed will was prepared in October, 1964. We shall consider the provisions of these wills later in this opinion.

When Mr. Osterhoudt visited the Fillmann home in April, 1963, in connection with the preparation of Rosa's will executed at that time, he suggested that the $25 a week payment for room and board by Rosa was too little and that Ann should increase the amount. Ann approached Rosa and requested an increase to $50 a week. Rosa bargained with Ann and finally stated, according to Ann's testimony: "Well, would you take forty?", and Ann replied: "Yes." Thereafter, for about a month and one-half, Rosa paid Ann $40 a week for her room and board. Rosa, however, was not pleased with this increase. Ann testified that after the raise in the amount of room and board she

told Reba Waple (Reba), wife of Fred, that Rosa was not pleased with the increase and that Reba replied: "Well, I would take her for $25 a week. I would do anything for money." Reba stoutly denies this, but, as we have indicated, we resolve this conflict in the testimony in favor of the caveators.

Ann testified that on Saturday, June 8, 1963, Rosa requested her to telephone Reba and request her to come over to see Rosa. Ann did this and Reba said that she wouldn't be able to come over in the afternoon, but would see Aunt Rosa that evening. Ann's son was playing baseball that evening and Ann and her husband, Frank, went to see their son play. When Ann and Frank returned about 8:00 p.m. Ann testified that Reba came running out of the house and as she passed by the automobile of the Fillmann's, stated: "They are having a battle royal in there. You better get in there. Aunt Rosa is coming to live with me and I will be over tomorrow to pack her things." Ann started for the house, but turned around and told Reba that "it wouldn't be necessary for her to come over to pack Aunt Rosa's things, if she was leaving I would pack them." Ann then rushed into the house and found her mother screaming and crying, almost in a state of shock. Aunt Rosa said that she was going to live with Fred and Reba and that "she wasn't wanted in my home any longer, and * * * she claimed my mother had been unkind to her." Ann also stated that Rosa said at that time that "Reba had told her that she wasn't wanted in my house." Here again, Reba denies that she made any such statement, but the conflict is resolved in favor of the caveators.

Frank testified that his mother-in-law, Lillie, had expected to play bingo in Laurel that Saturday evening and, although he did not think she was in any condition to play, he nevertheless drove her to Laurel, but after stopping for a cup of coffee, Lillie indicated that she was not up to playing and they returned home. Ann had put Rosa to bed before they returned. On the following morning, June 9, Frank walked by Rosa's room in the morning and she called him in. She wanted to know if Frank was coming to visit her after she moved to Fred's. Frank told her "No, I didn't think so, I wasn't wanted at Fred's." The Fillmanns had plans to go to the beach in the afternoon and Frank called Fred around 9:30 to 10:00 a.m. and said: "What time

do you plan to get here to pick up Aunt Rosa?" to which Fred replied: "I haven't made my mind up about that yet." Frank then said:

> "What do you mean, you haven't made up your mind about it, when your wife stood in the driveway yesterday and told my wife to get her ready, she would come to pack her things, she was going to live with you?
>
> "He says, 'That is what Reba said. I have something to say about this.'
>
> "I said, 'Well, we have plans to go to the beach this afternoon and I want to know what your plans are.'
>
> "He said, 'Well, right now I am getting ready to go to church.' He said, 'I will let you know what I am going to do.' And hung up the phone very abruptly."

Fred, who was called by the caveators as their witness, testified that before June 8th he had never discussed the possibility of Rosa moving in with him. When he got home from work Reba told him that Ann had telephoned that Aunt Rosa wanted her to ride out to see her about something. After they reached the Fillmann home Fred spoke to his mother and then went over to speak to Rosa who asked him: "Freddie, will it be all right with you if I come and live with you." He replied: "If that is what you want you are welcome." His mother Lillie became very upset when Rosa told her she was going to live with Fred and Reba and "just talked for ten or fifteen minutes, and no one said a word then. Aunt Rosa did not answer back, never said a word." Lillie began to scold Fred and finally he went outside stating that he was not going to stay there and "listen to this." He further testified that he "hadn't made up his mind what to do the next day" and had not decided "whether she could come to live with us or not." The following morning Frank telephoned Fred and asked him: "Are you coming over to get your Aunt?" Fred hesitated and then said: "Well, does she still want to come?", thinking that perhaps his aunt had changed her mind about leaving. Frank then stated: "Yes, she still wants to come. And if you don't come over here and get her

I am going to call her lawyer, Bill, and have her shipped back to New York." Fred then replied, "Well, then, Frank I am getting ready to go to church now. As soon as I get out of church I will drive right on out and pick up my aunt." Fred did this and Rosa went to live at Fred's home. When she arrived she was very happy. She later told Fred that she "was very unhappy" at Ann's house. Fred never discussed Rosa's financial affairs with her and did not know what arrangements, if any, had been made in regard to her room and board.

Reba testified that Rosa offered her $40 a week when she first came to her home, but Reba thought this was too much. Rosa then offered $35, then $30 a week, which Reba still thought was too much, and finally offered $25 a week, which Rosa said "is what the Fillmann's agreed to take me for," and Reba then agreed to accept $25 a week.

Rosa, after moving to the home of Fred and Reba was very insistent upon changing a savings account she had in order to be sure that Lillie would get nothing if Rosa died and in making a new will. Rosa changed the savings account, eliminating Lillie as a joint owner and substituting Reba in Lillie's place. She asked Reba to seek a recommendation from the Citizens Bank (where she had a savings account) for an attorney to advise her in connection with a new will. This was done and the bank recommended three attorneys. Two of the recommended counsel could not come to the house, but, the third, Faust C. Villareale, was free to come and did this. Mr. Villareale, one of the co-executors and a caveatee, was called as a witness for the caveators, and testified in regard to the executing of three wills prepared by him for Rosa. He was later called as a witness for the caveatees. He testified, without contradiction, that he had never known Fred or Reba prior to Reba's telephone conversation requesting him to come to see Rosa. When he interviewed Rosa she had before her the will of April 4, 1963, and told him "exactly how the will was to be changed." He made notes of her instructions and these notes were offered in evidence. The will of June 14, 1963, consisted of twenty-eight items. The principal differences between the will of April 4, 1963 and of June 14, 1963, were that in the latter will the legacy to Lillie was reduced from $10,000 to $1.00, Reba was included with a legacy

for $5,000, Pert's legacy was increased from $1,000 to $5,000, the legacy to Frank and Ann was reduced from $10,000 to $1.00, the residue was bequeathed to Fred instead of to Lillie, Frank and Ann, and Fred was named as executor, with Reba as alternate, instead of Frank, with Ann as alternate. The legacies to Fred for $10,000, to her nephew, Andrew B. Rogerson, for $10,000, to Frankie Fillmann (son of Frank and Ann) for $1,000 and to various other legatees remained the same, including the bequest of $5,000 to Mr. Osterhoudt, of $5,000 to The Methodist Church of Pleasantville, New York, and of $500 to the Trustees of the Masonic Hall and Asylum Fund who operated a Masonic Home at Utica, New York. There were identical provisions in regard to lapse in the event of failure to survive, the payment of succession and other death taxes, the *in terrorem* clause and the priority of payment to classes of legatees. Rosa executed the will of June 14, 1963, in the presence of Mr. Villareale, who expressed the opinion that she was quite normal and capable of executing a valid deed or contract. He had no reservations in regard to her mental capacity. Mr. Villareale sent the original will to Mr. Osterhoudt in Pleasantville at Rosa's request and forwarded a copy of the will to Rosa.

Rosa thereafter consulted with counsel in regard to recovering from the Fillmann's certain personal property which she claimed belonged to her. She had a letter prepared on July 29, 1963, to Frank, sending him a list of the personal property, consisting of some 23 separate items, and stating that her lawyer had advised her to send the list "so that you will allow the movers to bring them to me." She stated that she had made arrangements with the movers and would pay them for moving the property. She signed this letter and sent it to Frank. Shortly thereafter, Rosa received a typewritten letter, containing seventeen separate paragraphs, from Ann, in which Rosa was addressed as "Dear Mrs. Degenhardt." The substance of the letter was that the claimed personal property belonged to Ann, in that Rosa had given the articles to her, specific instances were given indicating a gift, there was a review of all that Frank had done for her and a statement of how hurt Frank was at the "circumstances which prompted you to leave his home," and then the following:

"If, after all of the foregoing, you feel you are still desperately in need of the remaining items in my house which you gave to me, please let me have your check in the amount of $240 to cover storage charges during the twelve-month period from July 1962 through June 1963, based on the average storage charges of $20 per month for the amount of furniture involved here. Also, let me have your check for $60 to cover the cost of restoring and painting these three lamps or ornaments and other furniture and picture frames mentioned previously.

"I would also like to present you with a bill for my husband's services for one year which I estimate to be between $1,500 and $2,000. However, he will not permit me to render a bill in this instance."

Sometime shortly prior to November 7, 1963, Rosa again consulted Mr. Villareale in regard to a new will. She had before her a copy of the will of June 14, 1963, and instructed him as to what changes she wished made. During all of his conferences with Rosa in regard to wills she indicated that she was "quite angry * * * with the people with whom she had lived previously to coming to the Waple house." He further stated:

"From what I understood, the basis of these changes was this disturbance that she had with them. She indicated they had kept some of her furniture, personal belongings of some kind, and now during the course of this trial this letter from Mrs. Ann Fillmann brings to mind the fact that she showed me this letter and wanted me to write and ask or represent her, and I told her to forget it, just grin and bear it, and I never did write an answer to that letter."

The will of November 7, 1963, was quite similar to the will of June 14, 1963, except that the legacy to Lillie of $1,000 was reduced to $1.00, the legacy to Pert was increased from $5,000 to $8,000, the legacy to Frankie Fillmann was reduced from $1,000 to $1.00, and the $5,000 legacy to Mr. Osterhoudt was eliminated.

654

Rosa on March 16, 1964, again consulted Mr. Villareale in regard to a new will. He made notes of her instructions, and prepared the will of March 17, 1964, contested in this case. This will is similar to the November 7, 1963, will except that the legacy for $1,000 previously bequeathed to the Woodlawn Cemetery was removed, the bequest to Pert of $8,000 was reduced to $5,000, the bequest to her nephew Andrew B. Rogerson was reduced from $10,000 to $8,000, the two bequests for the Masonic Lodge and the Trustees for the Masonic Home of $500 each were cancelled and the bequest to The Methodist Church of Pleasantville, New York was reduced from $5,000 to $2,000.

Mr. Villareale prepared the new will as instructed and presented it to Rosa on March 17. She read the will with the aid of her magnifying glass. Rosa had torn the November 7, 1963, will and put it in a trash container. Mr. Villareale told her she should not have done this, gathered up the torn parts and placed them in an envelope. This envelope and contents were introduced into evidence as one of the exhibits in the case. Mr. Villareale testified that Rosa was competent when she executed the will of March 17, 1964, and that he did not observe any one exercising any undue influence over her. Indeed he testified that in the execution of all three wills he had prepared he had not observed that any one in the Waple household had exercised any type of influence or persuasion over Rosa. He also stated that when he had his conferences with Rosa in regard to the wills they were alone, Reba perhaps having come in to give Rosa "a glass of water or something like that."

There were three subscribing witnesses to the will of March 17, 1964. They were Marjorie A. Bunyea, Charlotte A. Harris and Grace Arold. All three testified that they considered Rosa to be competent and capable of executing a valid deed or contract. We shall consider their testimony more fully later in this opinion.

Rosa read an advertisement in a local paper advertising the Magnolia Nursing Home and decided that it would be an attractive place where she could go and give Reba some rest. She went to Magnolia on June 4, 1964. She was much disappointed, complained of lack of attention and the poor meals, and, after her sweater had been inadvertently removed by one of the nurses

and washed (Rosa for a while, at least, thought it had been stolen), insisted on returning to the Waple home. This she did on Saturday, June 6, 1964, Reba and Mrs. Bunyea, who was acting as a part-time practical nurse, finding her dressed and ready to return when they went to see her.

After a fall, Rosa went to the Prince George's General Hospital from the last part of August, 1964, to September 7, 1964. Dr. Riccardo U. Franchi, who had been her attending physician since the late spring of 1964, having succeeded Dr. Hei K. Lee who had gone to Hong Kong, testified that he had recommended that she go into the hospital because of her physical condition. Rosa did not want to go, was not easily persuaded to do what she did not want to do, but finally did agree to enter the hospital. She was unhappy there because she believed she was not receiving proper attention and did not like the food, and finally Dr. Franchi consented to her return home sooner than he had planned.

After her return from the Prince George's General Hospital she wrote in her own handwriting on the back of an envelope dated September 12, 1964, the following:

> "In case of my death sell as few stocks as possible.
> I advise selling Allis-Chalmers, Niagara Mohawk and if the third has to be sold, Republic Steel. I want Fred and Reba to take the stocks. Names to be changed and their names in place of mine.
>
> "I have twenty thousand dollars in Citizens Bank."

On October 26, 1964, Rosa entered the Hyattsville Nursing Home. She was quite ill at the time. She conferred with her attorney, Mr. Villareale, and indicated that she wanted him to take care of her affairs as she was unable to do this and wanted him to prepare a new will leaving everything to The Methodist Church in Pleasantville, New York. She indicated that she was angry with the Waples. In the draft of the proposed new will, however, the $10,000 legacy to Fred was continued and the $5,000 legacy to Reba was *increased* to $10,000. A new legacy of $5,000 was included for Horace Hoghal of Pleasantville, New York, the legacy to The Methodist Church was increased from $2,000 to $5,000, the residue was bequeathed to The Meth-

odist Church and Mr. Villareale was named as sole executor. Mr. Villareale also prepared a petition for the appointment of a conservator which Rosa signed with difficulty, but the proposed will was never executed as Mr. Villareale did not think she was competent at that time. Later Rosa wished to have her affairs back in her own hands, discharged Mr. Villareale as her attorney and requested back her papers. The papers were returned to her, an order for the appointment of a conservator never having been signed by the Circuit Court. The proposed will was never executed. Rosa returned home with the Waples on November 5, 1964. She died at that home on November 19, 1964.

Additional evidence will be considered when the three principal questions are later discussed.

### (1) Mental Capacity

In considering Rosa's mental capacity to execute the will of March 17, 1964, we resolve all conflicts in the evidence in favor of the caveators, as well as all reasonable inferences that may be drawn from the evidence, *Ingalls v. Trustees, supra* (244 Md. at 247, 223 A. 2d at 779), but as we said in *Sachs v. Little,* 245 Md. 343, 363, 226 A. 2d 283, 294 (1967) :

> "The *whole* evidence is to be considered, and not merely that offered by the caveators. If there is a conflict in the testimony it is resolved in favor of the caveators, and they are entitled to all reasonable inferences in their favor from *all of the testimony.* See *Scheller v. Schindel,* 153 Md. 547, 551, 138 Atl. 415, 416 (1927). Uncontradicted evidence and unimpeached documentary evidence, however, cannot be ignored because it is unfavorable to the contention of the caveators." (Emphasis in original).

The evidence of the caveators taken in a light most favorable to them indicates that Rosa was an aged woman, 92 years of age when she executed the will of March 17, 1964, obese, deaf, with impaired sight, demanding, strong-willed and suffering from arteriosclerosis. At times she was feeble and forgetful. It is clear from our prior decisions that these disabilities do not

justify a finding of mental incapacity. *Sachs v. Little, supra* and *Ingalls v. Trustees, supra.* The caveators rely upon the testimony of Dr. Rosson, however, to justify submission of the issue of mental capacity to the jury.

Dr. Rosson had attended Rosa from September, 1962, to April, 1963. During this period he saw her five times in addition to the times he saw her daily in the hospital from September 26, 1962, to October 1, 1962. He had not seen Rosa or communicated with her after April, 1963, or some eleven months *prior* to the execution of the will of March 17, 1964. He gave Rosa a general physical examination in September, 1962, when she was 90 years of age, and his findings were as follows:

> "My findings were that she had osteoarthritis of a generalized nature, but primarily involving the hips, especially the left one, the knees, primarily the left one, and the lower spine, the lumbosacral part of the spine. She also had obesity; arteriosclerosis, generalized. I found on subsequent tests that she had diverticulosis. She also had a sliding hiatus hernia, and she suffered from impaired hearing and poor vision."

He expressed his opinion as follows:

> "In my opinion, in view of the rapid deterioration in her mental faculties over the period of time I knew her, I would expect that her ability to execute a will would be incompetent (sic) or very doubtfully capable of being valid."

In view of the legal presumption that every person is sane and the fact that the burden of proving the contrary rests upon those who challenge mental capacity, there is grave doubt that this indefinite future expectation, unrelated to the time of the execution of the will in question, has any probative value *at all* on the question of mental capacity involved in the present case. In *Ingalls v. Trustees, supra,* we followed *Arbogast v. Mac-Millan,* 221 Md. 516, 158 A. 2d 97 (1959), and quoted from Judge Horney's opinion, for the Court, in *Arbogast* as follows:

> "The law presumes that every man is sane and has capacity to make a valid will, and the burden of prov-

ing the contrary rests upon those who allege that he lacked mental capacity. *Cronin v. Kimble,* 156 Md. 489, 494, 144 Atl. 698, 700 (1929) ; *Smith v. Shuppner,* 125 Md. 409, 417, 93 Atl. 514, 517 (1915). Moreover, in the absence of proof of prior permanent insanity, it must be shown that the testator was of unsound mind at the time the will was executed in order to overcome the presumption of sanity. *Acker v. Acker,* 172 Md. 477, 192 Atl. 327 (1937) ; *Gesell v. Baugher,* 100 Md. 677, 60 Atl. 481 (1905)." (244 Md. at 260, 223 A. 2d at 786-787).

If Dr. Rosson's statement of opinion had any probative value, that probative value was eliminated by his testimony on cross-examination. He admitted that he had no knowledge of Rosa's mental or other condition as of the date of execution of the will and that "no one has ever told me when this will was made. I figured it was none of my business." He further stated that he did not know from his own observations "whether she improved or decreased in her mental capacity" from the time of her last visit to him in April, 1963. He admitted that when an investigator for the caveatees interviewed him on April 25, 1966, he told the investigator that Rosa was sharp about her money and that she was competent at the time he last saw her. Indeed, he wrote down on his record of Rosa's case, "Attested that patient was competent at the time I last saw her," and later stated that this was his opinion. He also stated that Rosa was a strong-willed person, who was rather frugal with her money and who requested him to give her *duplicate* prescriptions for her medicines so that she could order them in bulk from New York at a much reduced cost. This was Rosa's idea and he gave her the duplicate prescriptions.

The testimony of the caveatees is overwhelming and uncontradicted that Rosa was mentally capable *at the time the will of March 17, 1964, was executed.*

As we have indicated, *all* of those present when the will of March 17, 1964, was executed were of the opinion that Rosa was mentally competent and "capable of executing a valid deed or contract"—the test set forth in Code (1957), Article 93, Sec.

349. Mr. Villareale, the attorney for Rosa, called as a witness for the caveators, expressed this opinion without objection and without reservation. He properly indicated, in view of his ethical responsibilities as a member of the Bar, that he would not have presented a will to Rosa for execution if he had thought she was not mentally competent to execute it. Quite consistently with this testimony, he testified that he did not present the proposed will of October, 1964, to Rosa when it appeared to him that she was not at that time mentally competent to execute it.

The three lay subscribing witnesses, who have the right to express an opinion in regard to the competency of a testator on whose will they are subscribing witnesses without first demonstrating that they are qualified to testify—see *Kuenne v. Kuenne*, 219 Md. 101, 148 A. 2d 448 (1959)—testified that Rosa had the requisite mental capacity to execute the will. Moreover, in addition to their status as subscribing witnesses, each of them had a close association or acquaintanceship with Rosa, which gave their opinion in regard to Rosa's mental condition at the time of the execution of the will added importance. Mrs. Bunyea lived within a block and one-half from the Waple home and, for a modest consideration, acted as a practical nurse and helper for Rosa on a part-time basis. She testified that Rosa was "a lovely person" with whom she got along "very well." Rosa discussed her stocks with her, and on one occasion, asked her to buy a box of biscuits newly produced by one of the companies in which she had stock so that Rosa could personally test the company's new product. Rosa kept up with current events by listening to the television with a special hearing device. She knew exactly what dividends she would receive and exactly when they were due. She "had a very keen mind." She was "very proud of her appearance" and wanted her "hair fixed just so." Mrs. Bunyea, at Rosa's request, gave her a "home permanent," Rosa directing the exact amount of "blue" in the rinse. She put a pocket in a dress, which involved cutting the opening in the dress and sewing the new pocket together and on to the dress. Rosa also would string beads, using a needle and dental floss for this operation. Rosa told Mrs. Bunyea that Reba was an "angel" and that Ann was a "devil." She told the

witness how unhappy she was at Ann's home and some of the details of her reasons for leaving Ann's home. Rosa indicated that she had wanted to adopt Fred of whom she "thought the world" and said he was "a good man, good provider, good father." She also indicated that she would like to have adopted Reba whose efforts in Rosa's behalf worried her because Rosa "was afraid Reba was working too hard." Rosa anticipated litigation over her will and stated to the witness "They will fight it. Make sure Reba gets another lawyer too because they are going to fight it." The witness stated that Rosa's memory was "very good," and that she was "very intelligent." On March 17, 1964, she knew in the morning that she would later sign a will and especially requested the witness to be sure to "be back this evening so that you can witness the will." Rosa "looked forward to signing the will." Rosa was "very happy" at the Waple home, was devoted to the Waple children, and always had the $3.00 which the witness received for her services, ready to pay without having to be asked for it.

Mrs. Arold, who had lived diagonally across the street from the Waples' residence for some 24 or 25 years, had visited Rosa almost every day. They had much in common inasmuch as Mrs. Arold had, at one time, lived in Scarsdale, New York, only eight miles from Pleasantville, where Rosa had lived. Rosa accurately remembered the general area and described various places. Rosa told Mrs. Arold that her sister was "mean" and "they [apparently Lillie and Ann] were so mean to her" that she was glad to "get out of there," it was "like getting out of prison." Rosa stated that "she wasn't going to let her [Lillie] have any money." Rosa told Mrs. Arold that Fred was her favorite nephew, she was very fond of Reba, who was "very good to her." Rosa was interested in current events and although a Republican, liked President Johnson, stating "You vote for the right man." Rosa was "alert" and had a "very keen mind." She never observed any one exercising "any type of influence over her." Rosa was "strong-willed" and Mrs. Arold had no doubt that she was of sound and disposing mind when she executed the will of March 17, 1964.

Mrs. Harris lived less than a block away from the Waple residence. She had met Rosa shortly after she had moved to

the home. She observed Rosa watching and listening to tele-
vision. She was also a witness to the June 14, 1963, will and
was of the opinion that Rosa was mentally capable at that
time, as well as when the March 17, 1964, will was executed.
She testified that Rosa had not gone "down hill" mentally be-
tween the period elapsing between the time of execution of the
two wills.

Dr. Franchi, who succeeded Dr. Lee as Rosa's attending
physician in the late spring of 1964, after the execution of the
will of March 17, testified that Dr. Lee, who had gone to Hong
Kong to practice, had actually spoken to Dr. Franchi about
Rosa's mental condition. On the objection of counsel for the
caveators, Dr. Lee's record on Rosa was not admitted into evi-
dence, apparently because he had not left it in the office when
he left. Dr. Franchi testified that when he first saw Rosa—
some two months after the will of March 17 was executed—
he thought she was "an unusually alert lady" because "consid-
ering her age I thought she was still interested in her surround-
ings, and, as a matter of fact, she was bright and prompt in an-
swering the questions whether they were technically speaking
medical or whether they were about general environment." She
gave him her history, talked about the stock market, offered
to give the doctor "some good advice," but he was not inter-
ested in the stock market "so the conversation stopped there."
She knew more about the stock market than the doctor did,
he said. She was a witty person, had a good sense of humor
and was "an interesting patient. She would comment that she
was full of aches and pains, she was an old bag, but she would
still make it." She told Dr. Franchi that she was getting good
care and was "pretty happy the way she was treated." He fur-
ther testified that she was "a very strong willed person." Her
mental faculties were a little better than average, she had quite
an alert mind and, in his opinion, was of a sound and dispos-
ing mind from the time he first saw her until she went to the
Hyattsville Nursing Home. He recalled that he charged her
only $5 a visit, rather than the $7 a visit she had been paying,
"and she liked that." She would have the money counted out
for him, usually in one dollar bills. Later he raised his rate to
$7 and if she only had $5 ready, she would remember that she

owed him the additional $2 and would pay him the additional amount at a later date.

Dr. Franchi talked to Mr. Villareale on the telephone when the latter called the hospital while Dr. Franchi was visiting Rosa at the Hyattsville Nursing Home and told him that in his opinion Rosa was not "in mental condition to discuss legal powers" and Mr. Villareale agreed with him. The doctor stated that Rosa was not capable at the time of handling legal papers, but he had no doubt that this condition would later clear up. He also stated that in his opinion Rosa was not suffering from senile dementia.

Mrs. Norman Godwin, a neighbor who visited Rosa from time to time, testified that Rosa showed her some pictures of her late husband, told the witness how her family had mistreated her and "how wonderful Fred and Reba were to her, and how wonderful the children were, she was thankful to be with them." Rosa was careful about her appearance, dressed neatly and showed her handkerchiefs manufactured at her husband's handkerchief factory. Without objection, Mrs. Godwin testified that in her opinion in March, 1964, Rosa was of a sound and disposing mind, capable of executing a valid deed or contract. "She was quite capable of making any kind of papers. * * * She had a mind of her own."

Dr. Herbert Irving Earnshaw, a Doctor of Dental Surgery, was consulted by Rosa from October 27, 1962, through July 31, 1964. There were twelve visits in all, the visits of February 11, 1964, and May 8, 1964, being the visits nearest March 17, 1964, when the will in question was executed. Dr. Earnshaw testified that Rosa had a preconception that she wanted all of her teeth removed, as many had broken off or were otherwise defective. Dr. Earnshaw, after taking x-ray pictures, was convinced that many teeth could be saved and others restored by a non-removable bridgework. He described the difficulty he had with Rosa convincing her that his recommended course of treatment was the better thing to do. Although he had "difficulty leading her," he finally persuaded her to permit him to proceed with his recommended treatment. During the entire period of treatment he found her discussions with him were rational and he "had no reason or occasion * * * to suspect her mental ca-

pacity was any other than normal." Rosa was originally brought to Dr. Earnshaw by Ann who had been a patient of his for fifteen years. He had offered Rosa a considerable financial favor in the fee charged, but did not know how much this helped to persuade Rosa to accept his recommended treatment. He had no reason to doubt her mental capacity.

Fred Thomas Gheen, a certified public accountant, consulted with Rosa on February 13, 1964, in regard to her 1963 Federal income tax return. Rosa gave him the necessary information, including the date of her husband's death, and she knew about her stocks and earnings. She requested him to make up a list of her securities with the quotation prices. On one occasion he saw that she was reading the list with the aid of her magnifying glass. She was normal as far as he was concerned. Her mind did not wander and he detected no evidence of mental deficiency. Mr. Gheen had never heard of the Waples before he was called in to assist Rosa with her income tax and surmised that his name was selected from the telephone book. He had never worked for Mr. Villareale or for counsel for the Waples. He would have accepted a deed from Rosa for a piece of property if she were selling one and the "question of her competency just didn't enter my mind in any way."

As we have indicated, on an envelope postmarked April 9, 1964, some 23 days after the execution of the will of March 17, 1964, Rosa, in her own handwriting, wrote a note to Fred in regard to the policy to be pursued in any necessary sale of stocks, what stocks were to be first sold and in what order and giving an indication of the approximate amount of money she had in the Citizens Bank.

Mr. Villareale and Fred, called as witnesses by the caveators, testified that Rosa was of sound mind at the time of the execution of the will, as did Reba, called as a witness for the caveatees.

At the most, the entire evidence, taken in the light most favorable to the caveators, indicates a strong-minded and self-willed woman of 92 years of age who was occasionally forgetful, feeble, quarrelsome, given to making wills, and frequently angry with some members of her family. She suffered from arteriosclerosis, an enlarged heart, disabling arthritis and had impaired

hearing and vision. A medical witness was of the opinion that if her condition, which indicated mental competency when he last saw the testatrix some eleven months prior to the execution of the will, continued to deteriorate, it would be likely that she would be incapable of executing a valid will at some unnamed time, but the overwhelming and uncontradicted evidence was that Rosa's condition *did not continue to deteriorate,* but, on the contrary, on March 17, 1964, she was entirely competent to execute a valid deed or contract.

The various wills executed from time to time by the testatrix as well as the will of March 17, 1964, do not indicate any mental incapacity. In all of them the testatrix recognized the objects of her bounty, various charities, and the order of payment in the event of the diminution of her estate.

The testimony of Dr. Franchi, Dr. Earnshaw, and Mr. Gheen, as well as that of the witnesses to the will, neighbors, and others indicates that Rosa was entirely competent to execute a will on March 17, 1964. In our opinion there were no facts presented from which the jury could reasonably find or infer that the testatrix was not mentally capable of executing a valid deed, contract or will on March 17, 1964. The trial court should have granted the motion of the caveatees for a judgment n.o.v. on this issue.

### (2) Undue Influence

In *Shearer v. Healy,* 247 Md. 11, 23, 230 A. 2d 101, 106 (1967), we stated the Maryland law in regard to the proof necessary to establish undue influence vitiating a will as follows:

> "The Maryland law in regard to the required proof to establish undue influence vitiating a will was well stated by Judge (now Chief Judge) Hammond, for the Court, in *Stockslager v. Hartle,* 200 Md. 544, 547, 92 A. 2d 363 (1952), as follows:
>
> '* * * [U]ndue influence which will avoid a will must be unlawful on account of the manner and motive of its exertion, and *must be exerted to such a degree as to amount to force or coercion,* so that free agency of the testator is destroyed. The proof must be satisfactory *that the will was obtained by*

*this coercion* (although it need not be immediately exercised as of the date of the execution of the will if its influence causes its execution) or by importunities which could not be resisted, so that *the motive for the execution was tantamount to force or fear Mere suspicion that a will has been procured by undue influence, or that a person had the "power unduly to overbear the will of the testator" is not enough.* It must appear that the power was *actually exercised,* and that *its exercise produced the will.* The *burden of proof is on the caveator to meet these requirements of the law.'*

"The Court in *Stockslager* cited with approval and followed *Koppal v. Soules,* 189 Md. 346, 56 A. 2d 48 (1947). See also *Layman v. Conrey,* 60 Md. 286 (1883)."

There must be more than a suspicion that undue influence has been exercised. As our predecessors pointed out in *Dudderar v. Dudderar,* 116 Md. 605, 620, 82 A. 453, 459 (1911), quoting with approval from *Davis v. Calvert,* 5 Gill & J. 269 (1833):

"* * * 'honest and moderate intercession or persuasion or flattery unaccompanied by *fraud or deceit,* and where the testator has not been threatened or put in fear by the flatterer or persuader, or his power or dominion over him,' will not be sufficient." (Emphasis in original).

The caveators contend that the various facts and the inferences from them in the episode in October, 1964, at the Hyattsville Nursing Home, in Fred's disregard of his mother's upset condition resulting from Rosa's leaving the Fillmann home, in the facts and inferences surrounding Rosa's leaving the Fillmann home, in the frequent execution of wills after Rosa went to live with the Waples, in Fred's statement (which he denied) to his mother that he was now in the driver's seat in view of the execution by Rosa of the March 17, 1964, will, in the failure of the Waples to advise the rest of the family that Rosa was

going to the Hyattsville Nursing Home, and in Reba's statement to Pert (which Reba denied) that she should help to keep Mr. Villereale out of Rosa's room because Rosa was getting ready to execute a new will leaving everything to the Methodist Church, are sufficient in the aggregate to justify a submission of the issue of undue influence to the jury. We do not agree.

Assuming, arguendo, that the facts in the Hyattsville Nursing Home episode in October, 1964, were admissible at all as evidence of any alleged undue influence practiced by Fred and Reba on the testatrix over six months before when the will of March 17, 1964, was executed, there is nothing in those facts, and inferences from them, to indicate the exercise of any such undue influence. On the contrary, Rosa had complete access to her own personal attorney and had instructed him to prepare a new will *eliminating* Fred as residuary legatee and substituting the Methodist Church of Pleasantville, New York as residuary legatee. This hardly indicates a dominating influence of either Fred or Reba over the testatrix.

The facts surrounding Rosa's leaving the Fillmann home do not indicate any undue influence by Reba or Fred. On the contrary, Frank's testimony that Fred was uncertain on Sunday, June 9, 1963—the day after the upheaval between Lillie and Rosa and Rosa's request of Fred to move to his home—whether he would take Rosa, and the uncontradicted evidence that the Waples were unprepared in their home to receive Rosa on June 9, 1963, are inconsistent with any prior arrangement between Rosa and Fred or Reba to move Rosa into the Waple home. Indeed Ann, herself, testified that Rosa was a person who "didn't take no for an answer," and when she asked for anything, she must have it, "you could never tell her no." Pert, the sister of the testatrix and a witness for the caveators, when asked the question: "Did you ever try to dissuade her [Rosa] from making wills?" answered: "You couldn't. I didn't try. I didn't try because you couldn't." The overwhelming evidence of the caveatees, professional and lay, which has already been given in some detail, indicates that Rosa was strong-willed, mentally alert, could not be influenced and that when the various wills were made after June, 1963, was not influenced at all by either Fred or Reba. Indeed neither of them was present when the

wills were executed and Rosa at all times had the benefit of independent counsel.

Ann testified that her brother Fred "was very attentive to his mother all through my married life, and prior to that of course." The evidence did indicate that after June, 1963, Lillie, Fred's mother, obtained a lawyer to collect from Fred a balance of $200 on a $300 loan some eleven years before, which Fred contended his mother had given to him. After this unfortunate episode Fred's visits to his mother were less frequent, but before her death on December 24, 1964, the visits were resumed. In the alleged statement by Fred that he was in the driver's seat after the execution of the March 17, 1964, will, Ann testified that he added "Mother, I don't want you to worry, because I am going to take care of you." Fred's statement does not suggest that he used influence, undue or otherwise, in obtaining the execution of the will of March 17, 1964, and there is no evidence whatever that he did.

The uncontradicted evidence of many disinterested witnesses indicates that Rosa was gravely offended by Lillie and Ann and was determined that neither of them should share in her estate in any substantial way. She followed the same pattern in her will of June 14, 1963, in leaving her residuary estate to the person or persons caring for her, as she did in her prior wills after she left Pleasantville, New York and went to live with the Fillmanns. Indeed her hostility to her sister, Lillie, seemed to increase, inasmuch as she reduced her $1000 legacy in the will of June 14, 1963, to $1.00 in her will of November 7, 1963. Her hostility to Ann also seemed to increase as she reduced the $1000 to Frankie, Ann's son, in the June 14, 1963, will to $1.00 in the November 7, 1963, will. She continued the same pattern in the will of March 17, 1964. Fred has always been a favorite of his Aunt Rosa who wanted to adopt him when he was a boy. He was named for Rosa's husband and she expressed her affection for him, for Reba and for their children to many disinterested witnesses.

It is interesting to observe in Ann's letter of August 1, 1963, to which reference has already been made, and in which she addressed her Aunt Rosa as "Mrs. Degenhardt" and ended it "Yours truly," there is no accusation or suggestion that either

Reba or Fred had exercised undue influence on Rosa to get her to move in with them, but rather admonishes Rosa for her ingratitude in view of the many things Frank had done for her. It would seem reasonable to suppose that the contents and tone of this severe and demanding letter would have been quite different if Rosa had been thought to have been the victim of undue influence by which her will was overcome and dominated by Reba or Fred.

Taking all of the testimony in the light most favorable to the caveators and considering all inferences reasonably drawn from that testimony there is at most a bare suspicion of the possibility of undue influence exercised by Reba or Fred or by them both, and, as we have seen, this is not sufficient to justify the submission of the issue of undue influence to the jury. The trial court should have granted the caveatees' motion for a judgment n.o.v. on this issue.

### (3) Fraud

As we indicated in *Giardina v. Wannen,* 228 Md. 116, 129, 179 A. 2d 357, 364 (1962) : "Fraud connotes that the testatrix either did not know that she was signing a will, or that she was misled or deceived as to the provisions of the will."

There is no evidence whatever or any inference from the evidence which would justify a conclusion that Rosa did not know she was signing the will of March 17, 1964, or that she was misled or deceived in regard to its provisions. *All* of the evidence is to the contrary, and the trial court should have granted the motion of the caveatees for a judgment n.o.v. on this issue.

> *Order reversed and judgment n.o.v. entered in favor of the caveatees to the end that the verdict of the jury on issue No. 1 in regard to undue influence shall be answered "No", issue No. 2 in regard to mental capacity shall be answered "Yes" and issue No. 3 in regard to fraud shall be answered "No"; the costs of this appeal to be paid by the appellees.*